SMITH, APPELLANT, v. FORD MOTOR COMPANY ET AL., APPELLEES.

(No. C-76834—Decided April 19, 1978.)

*Messrs. Drew & Ward*, and *Mr. Kenneth Heuck, Jr.*, for appellant.

*Messrs. Rendigs, Fry, Kiely & Dennis*, and *Mr. Ralph F. Mitchell*, for appellee Ford Motor Company.

*Messrs. Lindhorst & Dreidame*, and *Mr. William M. Cussen*, for appellee Haag Ford Sales, Inc.

*Messrs. Benjamin, Faulkner & Tepe*, for appellee J. B. E. Olson Corporation.

*Messrs. McCaslin, Imbus & McCaslin*, for appellee T. R. W., Inc., Ross Gear Division.

PALMER, P. J. Plaintiff-appellant brought this action to recover damages for personal injuries suffered by the plaintiff in October 1968 when the delivery truck which he was driving suddenly left the roadway and plunged down a steep embankment near Lawrenceburg, Indiana. The plaintiff alleged in his complaint that the accident had

been caused by a failure of the truck's steering mechanism resulting from its faulty manufacture and assembly by the several named defendants,[2] and that the defendants were liable to respond in damages therefor under theories of strict liability, negligence and express warranty.

The evidence adduced by the plaintiff at trial reflects that in January 1967 the plaintiff placed his order for a "1967 Ford P-350 truck" with the defendant, Haag Ford Sales, Inc. (Haag). Upon its receipt of the order from Haag, and using its own employees and production facilities, the defendant-appellee Ford Motor Company (Ford) assembled the chassis of the plaintiff's truck, affixing the steering assembly thereto as a part of its assembly procedure. Ford then shipped the assembled chassis to the defendant-appellee J. B. E. Olson Corporation (Olson), a manufacturing concern which fabricated aluminum truck bodies of the type specially ordered for the truck by the plaintiff herein. Olson assembled the custom aluminum body to the truck chassis, connecting the uppermost part of the steering column to the instrument panel in the truck's cab. Upon the completion of its work, Olson delivered the finished truck directly to Haag, who was billed separately by Ford and Olson for, respectively, the chassis and body of the plaintiff's truck. The record is silent as to the exact character of the legal relationships existing, on the one hand, between Ford and Haag, and, on the other, between Ford and Olson during the period in which these and the following events transpired, there having been offered no meaningful evidence to demonstrate that either Haag, in soliciting and filling orders for the sale of Ford's products, or Olson, in assembling its custom van body to the truck chassis, was acting as an agent or subcontractor of Ford.

---

[2] Prior to trial, defendant Haag Ford Sales, Inc., was dismissed from the action below for jurisdictional reasons. During trial, the plaintiff entered into a partial settlement with defendant T. R. W. Inc., Ross Gear Division, who subsequently was dismissed as a party to the action. Thus, the only defendants remaining as parties to the instant appeal are the defendants-appellees Ford Motor Company and J. B. E. Olson Corporation.

In the months immediately after Haag's delivery of the truck to the plaintiff in April 1967, the plaintiff returned the truck to Haag for a variety of repairs, complaining of, *inter alia,* "tight" or "binding" steering. Haag's mechanics disassembled the steering mechanism and determined that several parts therein, including the steering shaft, required replacement. Accordingly, in September 1967, Haag replaced the worn parts with new bearings and a new steering shaft supplied to it by Ford, using the same nuts, bolts and holes to secure the placement of the steering assembly as were used in the original manufacture of the vehicle. All such repair work performed on the steering assembly by Haag was covered under the terms of the "New Vehicle Warranty" given for the truck by Ford, and, in accordance with instructions issued thereto by Ford, Haag returned the used steering parts to Ford's Warranty Disposition Center in Detroit, Michigan.

Thirteen months later, the plaintiff was injured in the accident which is the subject of this action. A post-accident inspection of the truck revealed that the steering shaft which earlier had been replaced by Haag was broken off completely at its base.

The plaintiff presented the testimony of three expert witnesses, all of whom stated that the fracture of the steering shaft was the result of metal fatigue, caused by a misalignment of the steering shaft between the chassis and body of the truck which subjected the shaft to extreme and intolerable tensile pressures. The plaintiff's experts uniformly agreed that the steering shaft was not misaligned when the truck chassis was shipped to Olson by Ford, but became so when Olson, while affixing the body of the truck fabricated by it to the truck chassis, improperly secured the top of the steering column to the instrument panel in the truck cab, deflecting the steering shaft contained therein from its intended path of alignment.

At the close of the plaintiff's case, both Ford and Olson filed motions for directed verdicts with the trial court, which granted the motion of Ford and denied that of Olson. Olson thereafter proceeded to present expert

testimony on its own behalf directly controverting the various conclusions urged by the plaintiff's expert witnesses. At the close of all evidence, the cause was submitted to the jury, which returned a verdict in Olson's favor. Judgment having been accordingly entered for both Ford and Olson, the plaintiff timely filed this appeal, presenting six assignments of error for review.

Passing for a moment the complex and troublesome issues presented in the appellant's first assignment of error, we first consider the merits of the second and third assignments, wherein the plaintiff asserts that the trial court erred in granting the directed verdict in Ford's favor on the issues of Ford's negligence in failing to warn the plaintiff of the defective condition of the steering assembly following its inspection of the original steering shaft removed from the truck and returned to Ford by Haag, and in improperly affixing the steering assembly to the truck chassis. As to the first of these, the record is devoid of any evidence to suggest that an inspection of the returned steering assembly parts would have alerted Ford to the existence of a defect in the alignment of the truck's steering column. The exact nature of the defects in the subject parts requiring their replacement by Haag was not fully explored by the plaintiff below, the parts themselves were not produced as evidence at trial, and the plaintiff's various expert witnesses offered no testimony from which the triers of fact could conclude or infer that a reasonable examination of the returned parts by Ford would have revealed to Ford that the steering column of the plaintiff's truck was dangerously misaligned. Indeed, the only evidence offered with respect to the subject parts was that they were in fact removed from the plaintiff's truck by Haag, and were thereafter returned to Ford.

The plaintiff's second claim that Ford negligently misaligned the steering assembly while mounting it on the truck chassis is equally without support in the record. The plaintiff presented no competent evidence to demonstrate that, as he now suggests, the steering gear box was affixed to a deformed chassis channel beam by Ford, producing the

misalignment of the steering column complained of herein. Indeed, all of the plaintiff's own expert witnesses testified that the alleged misalignment occurred when the steering column was improperly attached to the body of the truck by Olson, and uniformly and unequivocally rejected the notion that the steering assembly could have been misaligned by Ford in its assembly of the truck chassis. Given these circumstances, we agree with the trial court that Ford could not reasonably have been found by the jury to have been negligent in either of the respects asserted by the plaintiff. If follows, then, that the trial court properly granted the directed verdict in Ford's favor on the issues of Ford's negligence in causing the injuries complained of by the plaintiff, and that the plaintiff's second and third assignments of error are, accordingly, overruled.

The plaintiff's fourth assignment of error complains of the trial court's action in granting Ford's motion for a directed verdict as to that part of the plaintiff's complaint setting forth a claim for damages based upon Ford's alleged breach of its express warranty of the plaintiff's truck. The record, however, reflects that the terms of the warranty issued for the truck by Ford expressly limited its effective life to the truck's first two years or 24,000 miles of operation, whichever occurred first. The record also reflects, and the plaintiff readily admits, that the subject truck had been driven in excess of 36,000 miles at the time of the accident. Thus, the express warranty relied on by the plaintiff herein had, by its very terms, expired long before the plaintiff's claimed cause of action thereunder arose. The plaintiff has presented, and we are aware of, no convincing authority to support his contention that the failure of Haag to correct the alleged condition of misalignment at the time it made the warranted repairs to the truck's steering assembly in some manner tolled indefinitely the running of the express warranty of the truck by Ford. The assignment of error is without merit, and is accordingly overruled.

Our determination that the trial court properly withdrew from the jury's consideration the issues of Ford's

liability to the plaintiff under the proposed theories of negligence and express warranty leaves for our consideration the more vexatious question, raised in the plaintiff's first assignment of error, of the propriety of the trial court's similar disposition of that part of the complaint asserting Ford's liability to the plaintiff under the rules of strict products liability set forth in *Lonzrick* v. *Republic Steel Corp.* (1966), 6 Ohio St. 2d 227, and *State Auto Mutual Ins. Co.* v. *Chrysler Corp.* (1973), 36 Ohio St. 2d 151. See also *Temple* v. *Wean United, Inc.* (1977), 50 Ohio St. 2d 317. The plaintiff argues that his evidence at trial was sufficient to permit the trier of fact to conclude that he had met his burden of alleging and proving, by a preponderance of evidence, that:

"* * * (1) There was, in fact, a defect in the product manufactured and sold by the defendant; (2) such defect existed at the time the product left the hands of the defendant; and (3) the defect was the direct and proximate cause of the plaintiff's injuries or loss."

*State Auto Mutual Ins. Co.* v. *Chrysler Corp., supra.* at 156. Given such a state of the record, the plaintiff asserts, the trial court was required to submit the issue of Ford's strict liability to the jury.

The court below, in its Findings of Fact and Conclusions of Law filed in conjunction with its award of the directed verdict to Ford, apparently was satisfied that the plaintiff had met his burden of proving the existence of a defect in the truck— *viz.*, the misalignment of the steering column—which was present at the time the truck was sold to the plaintiff and which proximately caused the plaintiff's injuries. However, since all of the plaintiff's evidence as to the origin of the misalignment tended to demonstrate that it had occurred after the truck chassis had been delivered to Olson's control by Ford, the trial court found that there was no defect in the truck at the time it left Ford's hands, and concluded that, as a matter of law, Ford could not be held strictly liable to the plaintiff under the rules set forth in *Lonzrick* and *Chrysler*.

The plaintiff presents a variety of challenges to the trial court's determination, one of which asserts that his evidence was sufficient to permit the jury to conclude that Haag, in selling and delivering the truck to the plaintiff, was acting as the agent of Ford. Therefore, the plaintiff argues, the alleged defect in the steering assembly of the truck, which was shown to have existed, arguably, at the time the truck was delivered to the plaintiff by Haag, was in fact present when the truck passed from Ford's possession and control through the hands of its agent. The plaintiff's contention, however, is unsupported by the record, which reflects that the only evidence offered by the plaintiff to establish the alleged agency relationship between Haag and Ford consisted of testimony by an agent of Haag stating that Haag was required to follow certain administrative and technical procedures prescribed by Ford when performing warranty repair work on the latter's vehicles, and the invoice for the truck issued by Haag to the plaintiff which, in addition to reciting Haag's corporate name and address, bore twin stamps of Ford's trademark emblem. Such evidence, standing alone, clearly is not of a quantum or quality which would permit a trier of fact to reasonably find the existence in law of an agency relationship permitting the attribution to Ford of Haag's delivery of the defectively completed product, particularly when such evidence is viewed in light of subsequent unrebutted testimony by the same agent of Haag, elicited during cross-examination by Ford's counsel, that he, and not Ford, exerted complete and autonomous control over Haag's business operations. Thus, as a matter of law, Ford could not be held strictly liable to the plaintiff in the instant case, under the rules of law set forth in *Lonzrick* and *Chrysler*, based upon any alleged agency relationship with Haag.

The plaintiff additionally suggests that Ford is strictly liable for any defects, regardless of origin, present in the truck at the time it was delivered to the plaintiff under the rule stated by the Court of Appeals for the Fifth Appellate District in *Mobberly* v. *Sears, Roebuck & Co.* (1965), 4 Ohio App. 2d 126, 132, as follows:

"If a company puts out in its own name and as its own product machinery which is manufactured by another, it is subject to the same liability as though it were its manufacturer."

The plaintiff asserts, and the record reflects, that the evidence before the trial court on Ford's motion for a directed verdict, when construed in accordance with Civ. R. 50(A), was sufficient to permit the conclusion that, although the body of the plaintiff's truck was manufactured and assembled to the truck chassis by Olson, a manufacturing concern of no discernible legal relationship with Ford, the completed truck, in its entirety, was marketed and sold to the plaintiff as a product of Ford. Thus, the agent of Haag who sold the truck to the plaintiff described it as a "1967 Ford P-350 truck," the owner's manual issued with the truck congratulated the plaintiff on his purchase "of this fine Ford product," the warranty given for the truck by Ford guaranteed "each part of this Ford-built vehicle [including those manufactured and assembled by Olson] to be free * * * from defects in material and workmanship" for the warranty period, and Ford's service representative for its Cincinnati District Sales Office, in response to a letter of complaint by the plaintiff, expressed concern for the problems experienced by the plaintiff with his "1967 Ford parcel delivery unit."

However, even in view of the foregoing evidence, we are unable to conclude that the rule set forth by our brothers in *Mobberly* required submission of the plaintiff's claim to the jury below. The defendant in *Mobberly*, Sears, Roebuck & Co. (Sears), was a large retailer of various manufactured goods who had arranged with a third-party manufacturer for the fabrication of a portable farm grain elevator to be marketed by Sears under its own name. The elevator, when completed, was *delivered directly to Sears,* who, having placed its name on the product, sold it for use by the plaintiff. The Court of Appeals held—properly, we believe—that, under the circumstances, Sears was liable to the plaintiff *in negligence* for the faulty design of the elevator, a defect of which Sears, as the ultimate and actual

seller of the product for which it had contracted, was or should have been aware.

The facts of the case before us differ markedly from those presented to the court in *Mobberly*. The Ford delivery truck, unlike the improperly designed grain elevator marketed by Sears, was not sold in its finished (and defective) state directly by Ford to the plaintiff. To the contrary, the record clearly reflects that the completed truck did not re-enter Ford's possession or control at any time after it had been delivered to Olson, free of any defects, for further assembly. Moreover, the plaintiff's claim in the instant case—based as it is upon the theory of strict products liability—asserts a cause of action neither discussed in nor anticipated by the *Mobberly* decision, which was addressed solely to the question of a non-manufacturing defendant's liability in negligence to a consumer of its products, and which antedated, by one year, the Ohio Supreme Court's initial attempts, in *Lonzrick*, to frame the rules governing a plaintiff's proof of strict liability. Thus, while *Mobberly* may express a perfectly sound rule of negligence law applicable to non-manufacturing sellers of consumer goods, it cannot be read as authority for holding a defendant—such as Ford—strictly liable for defects in a product which, although bearing the defendant's name, was free of any such defects at the time it left the defendant's hands.

Nevertheless, our examination of various cases from other jurisdictions has suggested to us two recognized variants among the traditional rules of strict liability which, if adopted herein, would require us to hold that the plaintiff's claim of strict liability against Ford was improperly withdrawn from consideration by the jury below. The first of these expresses a concept not too far removed, at first glance, from the principle of negligence law articulated, perhaps overbroadly, in *Mobberly*, and holds that a defendant who places his trademark or tradename on a product which is manufactured, in whole or in part, by a third party remains strictly liable for any defects in the product at the time of its purchase by its ultimate consumer,

regardless of the origin of such defects. See, *e. g., Gizzi* v. *Texaco, Inc.* (C. A. 3, 1971), 437 F. 2d 308; *Kasel* v. *Remington Arms Co.* (1972), 24 Cal. App. 3rd 711, 101 Cal. Rptr. 314; *Dunham* v. *Vaughn & Bushnell Mfg. Co.* (1969), 42 Ill. 2d 339, 247 N. E. 2d 401; *Walker* v. *Decora, Inc.* (Tenn. 1971), 471 S. W. 2d 778; 2 Hursh & Bailey, American Law of Products Liability 2d 108-110, Section 7:2 (2d ed. 1974), and cases cited therein; Goldstein, *Products Liability and the Trademark Owner: When a Trademark Is A Warranty,* 32 Bus. Lawyer 957 (1977), and cases cited therein. However, the rule differs significantly from that expressed in *Mobberly,* which held a non-manufacturing seller liable only for those defects which the seller could or should have discovered; the liability imposed under the instant rule is strict, and reflects the principle that a non-manufacturing defendant who lends his trademark or tradename to a product is to be viewed as an absolute guarantor of the fitness or quality of the product, upon whom the consumer has been induced to rely as a result of, *inter alia,* massive advertising campaigns. See, *e. g., Gizzi* v. *Texaco, Inc., supra;* Goldstein, *supra,* at 961-62. Thus, as was noted by the court in *Kasel* v. *Remington Arms Co., supra,* at 725, 101 Cal. Rptr. 323:

"It is the defendant's participatory connection, for his personal profit or other benefit, with the injury-producing product and with the enterprise that created consumer demand for and reliance upon the product (and not the defendant's legal relationships (such as agency) with the manufacturer or other entities involved in the manufacturing-marketing system) which calls for the imposition of strict liability."

In addition to the rule of strict trademark or tradename liability, the cases suggest a second ground for holding a defendant strictly liable for defects in a product resulting from its defective manufacture by third parties. Thus, where a manufacturer or assembler who markets a completed product surrenders possession and control of the product in an uncompleted state, *knowing or reasonably expecting that it will undergo further change or modifi-*

*cation before its ultimate use by the consumer*—as where the final part of the manufacturing process is delegated to a third party—the manufacturer or assembler remains strictly liable for any defects flowing from such known or anticipated change. See *Vandermark* v. *Ford Motor Co.* (1964), 61 Cal. 2d 256, 391 P. 2d 168; *Sabloff* v. *Yamaha Motor Co.* (1971), 113 N. J. Super. 279, 273 A. 2d 606; *Sharp* v. *Chrysler Corp.* (Tex. Civ. App. 1968), 432 S. W. 2d 131; *D'Antona* v. *Hampton Grinding Wheel Co.* (1973), 225 Pa. Super. 120, 310 A. 2d 307. The courts, in applying the rule, have stated that such anticipated change in a product does not constitute a "substantial" change therein which, under traditional rules of products liability, might otherwise relieve the original manufacturer of strict liability therefor. Thus, the court in *D'Antona* v. *Hampton Grinding Wheel Co., supra,* in determining that the placement of a grinding wheel on the defendant's grinding machine did not preclude recovery from the defendant under a theory of strict liability for injuries suffered when the grinding wheel exploded, noted that:

"A seller is liable under [Restatement (Second) of Torts] Section 402A for defects in its product if '[the product] is expected to and does reach the consumers without substantial change.' As a matter of law, we cannot say that the attachment of [the]wheel to [the defendant's] machine was a substantial or an unexpected change in [the defendant's] product. *The test in such a situation is whether the manufacturer could have reasonably expected or foreseen such an alteration; * * *.*" *Id.,* at 125, 310 A. 2d 310. (Emphasis added.)

More to the point in the instant case, the Supreme Court of California, in a seminal products liability case, held an automobile manufacturer strictly liable for defects in one of its automobiles resulting from the improper completion of certain expected modifications therein by a third party:

"Since the liability is strict, it encompasses defects regardless of their source, and therefore a manufacturer of a completed product cannot escape liability by tracing the

defect to a component part supplied by another. * * * These rules [of strict liability] focus responsibility for defects, whether negligently or nonnegligently caused, on the manufacturer of the completed product, *and they apply regardless of what part of the manufacturing process the manufacturer chooses to delegate to third parties.* It appears in the present case that Ford delegates the final steps in that process to its authorized dealers. It does not deliver cars to its dealers that are ready to be driven away by the ultimate purchaser but relies on its dealers to make the final inspections, corrections and adjustments necessary to make the cars ready for use. Since Ford, as the manufacturer of the completed product, cannot delegate its duty to have its cars delivered to the ultimate purchaser free from dangerous defects, it cannot escape liability on the ground that the defect in [the plaintiff's] car may have been caused by something one of its authorized dealers failed to do." *Vandermark* v. *Ford Motor Co., supra,* at 261, 351 P. 2d 170. See also *Sabloff* v. *Yamaha Motor Co., supra.*

Neither of the foregoing rules constitutes, in our opinion, an unwarranted or untenable extension of the more traditional principles of products liability. The broad principles of public policy which the courts have cited as justification for the imposition of strict products liability in the first instance would suggest, if not compel, the conclusion that such liability should be shared by a defendant who profits by placing his trademark or tradename on a product, thereby adopting it as his own, or by a defendant who chooses, for whatever reason, to have a third party assume and complete steps in the manufacture or modification of the defendant's product for which the defendant would otherwise be responsible.

Moreover, application of either rule to the instant case would be justified by the evidence adduced by the plaintiff below. At the very least, the plaintiff's evidence that the truck was a Ford product would present a jury question as to Ford's strict liability to the plaintiff as a tradename guarantor of the truck. Similarly, the plaintiff's evidence

would have permitted the jury to conclude that Ford, upon relinquishing control of the assembled truck chassis, knew that the chassis would be required to undergo further manufacture and assembly—including the placement of the body thereon by Olson—before its delivery, as a completed Ford product, to the plaintiff, and that Ford therefore was liable for any defects in the completed truck occurring as a result of such modification. In either instance, then, the trial court's award of the directed verdict to Ford at the close of the plaintiff's case would be deemed to have been improperly granted.

However, our adoption of either of the above rules—a course toward which our reflections would otherwise incline us—would require, to be candid, a marked departure from the traditional rule originally set forth by our Supreme Court in *Lonzrick* and *Chrysler*, and reaffirmed most recently in *Temple* v. *Wean United, Inc., supra,* that a plaintiff, in order to hold a defendant strictly liable in tort, must prove that the defect complained of in the defendant's product *existed at the time it left the defendant's hands.* This principle served as the fundament for the decision of the court below, and, whatever our inclinations to the contrary, we are unable to perceive, in any of the Supreme Court's several pronouncements on the subject, any authority for reaching a contrary result. Thus, confronted with the plaintiff's absolute failure to prove the existence of any defect in the truck at the time it left Ford's control, and in the absence of any apparent authority to adopt a rule of strict liability relieving the plaintiff of his burden to adduce such proof, we conclude that, as a matter of law, Ford could not be held strictly liable to the plaintiff in the instant case, and that the trial court properly granted Ford's motion for a directed verdict at the close of the plaintiff's case. The assignment of error cannot therefore be sustained, and is accordingly overruled.

The plaintiff in his fifth assignment of error, claims that the trial court erred in denying his motion for a new trial, arguing that the court's award of the directed verdict in Ford's favor "so confused and tampered with the

minds of the jurors and their concept of liability that they could not find [Olson] liable on the same theories argued against [Ford].'' We disagree. The plaintiff made no attempt to demonstrate, on the record, the claimed confusion of the jury below, and none may be inferred from the mere fact that the jury returned a verdict in Olson's favor at the close of all evidence. Moreover, the plaintiff has presented no authority to support the proposition that a directed verdict granted to one of several defendants against whom a plaintiff has asserted identical claims is *per se* fatally prejudicial to the plaintiff's claims against the remaining defendant or defendants. Such an assertion, if carried to its logical conclusion, would prohibit the award of a directed verdict in favor of fewer than all multiple defendants in any single action, and would thus impose an impermissibly restrictive gloss upon the power of trial courts to award directed verdicts pursuant to Civ. R. 50 (A). The assignment of error is without merit, and is overruled.

In his sixth and final assignment of error, the plaintiff asserts that the judgment rendered on the jury verdict in favor of Olson was against the manifest weight of the evidence, essentially arguing that the testimony of Olson's expert witnesses, who stated that the steering shaft broke not as a result of any misalignment thereof, but as a result of impact damage sustained by the truck immediately prior to or during plaintiff's accident, was so incredible that, as a matter of law, it should have been disregarded by the triers of fact. However, we conclude from our examination of the evidence presented by Olson—which consisted of the testimony of a qualified metallurgist and an automotive engineer, both of whom had examined and tested the steering shaft in question, and the testimony of an agent of Olson who described in detail the technical procedures followed in assembling a truck body to its chassis to support his conclusion that the steering assembly could not have been misaligned by Olson—that such evidence was not the product of obvious fabrication or deceit and, therefore (or otherwise), patently incredible.

Olson's evidence, which directly controverted that offered by the plaintiff, presented a genuine issue of fact as to the existence of any defect in the truck for which Olson might be liable to the plaintiff. Under these circumstances, we are unable to conclude that the jury's resolution of the issue in Olson's favor was against the manifest weight of the evidence, and the assignment of error is, accordingly, overruled.

The judgment is affirmed.

*Judgment affirmed.*

BLACK, J., concurs.
KEEFE, J., dissents.

KEEFE, J., dissenting. Respectfully, I am unable to join with my brothers in affirming the judgment below as to the Ford Motor Company. (I am in agreement with the affirmance as to the Olson Company.) The judgment granting Ford's motion for a directed verdict is untenable and I would reverse it and remand for further proceedings, which would entitle the plaintiff Smith to a new trial against Ford.

The trial court found that the plaintiff proved the existence of a defect (the misalignment of the steering column) at the time the van was sold to him. However, the court below and the majority of this court do not consider that plaintiff falls squarely within the ambit of *Lonerick* because plaintiff was unable to show that the misalignment occurred before Ford shipped the chassis to Olson, *i. e.,* before the product left the hands of the manufacturer. I do not believe, however, that the word "manufacturer" must be interpreted so narrowly. The following language of *Mobberly* v. *Sears, Roebuck & Co.* (1965), 4 Ohio App. 2d 126, 132 seems apt at this point:

"If a company puts out in its own name and as its own product machinery which is manufactured by another, it is subject to the same liability as though it were its manufacturer."

2 Restatement of Torts 2d, Section 400 (1965), states a similar position as follows:

"Selling as Own Product Chattel Made by Another.

"One who puts out as his own product a chattel manufactured by another is subject to the same liability as though he were its manufacturer."

I am not unaware that *Mobberly* was a case based on negligence in design, not strict liability. However, once a plaintiff has shown the existence of a defect in a product at the time he purchased it—the first step into the realm of strict liability— he should be able to rely on the rule announced in *Mobberly*. In the instant case Ford itself manufactured the chassis and marketed the finished vehicle in its own name and as its own product and warranted it. With regard to the plaintiff, therefore, Ford should be answerable for a defect in the product. If Ford believes that Olson's work might be the cause of the misalignment, Ford may have a separate action against Olson or a crossclaim in the instant case as to liability *inter se.*

Plainly, this case presents a jury question. I respectfully dissent and favor a reversal of the judgment as to Ford.