**GROVER HILL GRAIN CO., Plaintiff-Appellant,**

v.

**BAUGHMAN–OSTER, INC., Defendant-Third Party Plaintiff-Appellee,**

**Champion Screw Company, Third Party Defendant-Appellee.**

No. 81–3600.

United States Court of Appeals, Sixth Circuit.

Argued Oct. 29, 1982.

Decided March 5, 1984.

---

John P. McMahon argued, Terence P. Kemp, Baker & Hostetler, Columbus, Ohio, for plaintiff-appellant.

John A. Pietrykowski, Manahan, Pietrykowski & Bamman, Andrew J. Ayers argued, Toledo, Ohio, for defendant-third party plaintiff-appellee.

Michael L. Hardy, Cleveland, Ohio, for third party defendant-appellee.

Before LIVELY, Chief Judge, WELLFORD, Circuit Judge, and WILHOIT, District Judge.*

* Honorable Henry R. Wilhoit, Jr., United States District Court for the Eastern District of Kentucky, sitting by designation.

WILHOIT, District Judge.

On October 29, 1978, an enormous metal grain bin collapsed at the premises of plaintiff-appellant, Grover Hill Grain Co. of Grover Hill, Ohio.[1] Its collapse caused 90,000 bushels of shelled corn to spill out onto the ground. The bin in question was purchased in September, 1976, from its manufacturer, and designer, defendant-appellee, Baughman-Oster, Inc., of Taylorsville, Illinois.[2] It came to Grover Hill complete (including bolts) but *unassembled*. During the period of 1974–1977 appellant purchased eight Baughman bins and in each instance they were acquired through Baughman's distributor and authorized dealer, William J. Ross, Jr.[3]

Appellant contracted with Ross to erect the 1976 grain bin. It had a diameter of 48 feet and was designed to rise to a height of 22 rings (about 60 feet) with a capacity of approximately 90,000 bushels of shelled (dry) corn.

Baughman had delivered all prior bins purchased by appellant as a complete but unassembled package. This 90,000 bushel bin was the largest one ever delivered between 1974–1976. An erection manual had been supplied with each and every bin, *except* the 1976 bin in question. Each manual contained a bold print warning that bolts used in assembly should *not* be tightened to more than fifteen (15) pounds pressure. Baughman supplied Grade 2 bolts.[4]

In 1977, a rather salient circumstance arose when Baughman delivered another 90,000 bushel bin to Grover Hill Grain to be assembled by Ross. In this instance the bolt pattern in the bottom four rings was re-designed to provide three times the number of bolts in the horizontal joint as compared to the bolt design of the 1976 bin. Moreover, the bolts supplied were Grade 8 (stronger) bolts. This bin was assembled and erected by Ross in the same manner as all other bins supplied by Baughman. As far as we know the 1977 bin has continued to stand beside the ruins of the 1976 bin and this *circumstance* is claimed by appellant as immutable evidence to its right to recovery.

In erecting the 1976 bin, as well as all others, Ross used an electric impact wrench and testified that he personally tightened 85% to 90% of the bolts where the electric wrench was used.[5] Notwithstanding the fact that an assembly manual was not supplied with the 1976 bin, with its warning to serve as a reminder that the bolts should not be "over-torqued," Ross claimed that from past experience he was not unmindful of Baughman's warning that the bolts were not to be tightened beyond 15 pounds pressure.

Apparently there was technology available to assist the assembler to accurately determine when a bolt has been sufficiently tightened. Many electric impact wrenches are equipped with a "torque brake" that can be mechanically pre-set by the operator to drive the bolt to the desired tightness.

Unfortunately, this was *not* the technology employed by Baughman's dealer, Mr. Ross. Utilizing hand wrenches, all or nearly all, the bolts were "tested" as to 15 pounds torque. Armed with this, Ross was able to assure the trial court that none of the bolts in the 1976 bin had been "over-torqued."

1. Grover Hill Grain Co. is an association of several grain farmers organized for the purpose of buying, selling, drying and storing wheat, corn and other feed grains produced in the vicinity of their business.

2. Baughman is a division of National Steel Products Co., a wholly owned subsidiary of National Steel Corporation.

3. Ross is a farmer, owns a gas station in Grover Hill and has erected grain bins since 1970.

4. This became one of the bones of contention. Ross claimed that Baughman had sent the wrong size bolts. Grade 8 bolts had been supplied to him for erecting smaller bins *prior* to September, 1976.

5. These bins are constructed by bolting together panels of sheet metal that are 32 inches high and 10 feet long. The panels are joined end to end until they form a circle or ring. These 32 inch high rings are then stacked to the desired height. The 32 inch high joint between panel ends is called a "vertical seam." The joint between rings is called a "horizontal seam."

The record discloses that the bin in question was filled to capacity with shelled corn in 1976; with wheat in 1977 and again with shelled corn in 1978. Several days before its collapse, several bolt heads were noticed on the ground about the bin. Ross and Baughman were immediately notified and frantic efforts to shore the bin with cables proved futile. Several *vertical* joints failed causing the eventual collapse and spillage before the bin could be emptied of its contents in a more orderly fashion.

Appellant filed suit in state court against Baughman alleging strict liability and breach of warranty. A diversity of citizenship was found to exist and the action was removed to United States District Court for the Northern District of Ohio. Baughman impleaded Ross and Champion Screw Company.[6] Ross was subsequently dismissed by agreement of all the parties.

This case was tried by the Court without the intervention of a jury. The trial judge concluded that no warranty, express or implied, was applicable; that no design defect or deficiency in the bolts was established by the proof; and, finally, that Ross was an independent contractor and the bin's collapse was due to the over-torquing of the bolts—an independent intervening force—a proximate cause in bringing about the failure of the bolts and subsequent failure of a significant number of vertical seams in the bin.

Grover-Hill, disappointed by the above findings and conclusions, prosecutes this appeal and lays before us the following propositions that would justify a reversal:

1) Appellee as manufacturer and supplier of the bin components should be held strictly liable for any failures in assembly by an erecting contractor-dealer.

2) The court below erred in not holding appellee liable for its failure to warn Ross, the contractor-dealer, of the dangers involved in over-torquing.

3) The district court failed to make necessary findings of fact whether Ross was acting as agent for appellee.

4) The district judge misapplied Ohio law in requiring expert proof to show a design defect.

## I.

The trial judge found that the defect which caused the collapse of the bin was introduced after the unassembled bin left the appellee's hands. Specifically, the District Court Judge concluded that the appellee's distributor, Ross, overtorqued the bolts while constructing the grain bin, causing the eventual collapse.

However, appellant argues that the appellee's responsibility to market a non-defective product did not end until the bin was actually constructed. According to the appellant, the appellee was responsible for introducing the bin into the stream of commerce and derived a significant economic benefit from selling and eventually having assembled a grain bin carrying its trademark.

Citing *Vandermark v. Ford Motor Co.,* 61 Cal.2d 256, 37 Cal.Rptr. 869, 871, 391 P.2d 168, 170 (1971), appellant states that any manufacturer, who markets a product in an uncompleted state and surrenders that product to a third-party, knowing or reasonably expecting that the final part of the manufacturing process will be completed by this third-party prior to its ultimate use by a consumer, is strictly liable for any injuries stemming from a defect introduced during the final construction of the product.

This same theory of strict products liability was considered by the Ohio Court of Appeals in *Smith v. Ford Motor Co.,* 59 Ohio App.2d 41, 392 N.E.2d 1287 (1978). In *Smith* the plaintiff placed an order with an authorized Ford dealer for a 1967 Ford P–350 truck. *Id.,* 392 N.E.2d at 1290. This was a specialty order which required the Ford Motor Company to assemble the truck chassis only. Ford then shipped the chassis to the J.B.E. Olson Corporation, knowing

---

6. Champion was thought to be the supplier of    the bolts in question.

that Olson would complete the manufacturing process by placing a custom aluminum body on the truck chassis. Upon completion of its work Olson delivered the truck to the Ford dealer who sold the truck to the plaintiff. *Id.*

Subsequently, an accident occurred and the plaintiff was injured. An inspection of the truck revealed that the cause of the accident was the steering shaft which had broken off completely at its base. *Id.* 392 N.E.2d at 1291. The expert testimony indicated that the fracture of the steering shaft was due to metal fatigue, caused by a misalignment of the steering shaft between the truck chassis and body. The same expert evidence demonstrated that the misalignment was solely the result of the J.B.E. Olson Corporation having improperly secured the top of the steering column to the instrument panel in the truck cab. *Id.*

At the close of the plaintiff's case Ford was granted a directed verdict. *Id.* On appeal the plaintiff-appellant, asserted that even though Olson actually created the defect, the Ford Motor Company should be held strictly liable for the appellant's injuries because the completely assembled truck was marketed and sold as a Ford product. *Id.* 392 N.E.2d at 1293.

The Ohio Court of Appeals stated two theories under which Ford might be found liable. First, a defendant who places his trademark or trade name on a product, manufactured wholly or in part by a third party, should be strictly liable for a defect in the product at the time it reaches the user, regardless of the origin of the defect. *Id.* 392 N.E.2d at 1294. Secondly, the court expressed the theory of liability argued by the appellant in the instant appeal. *Id.* The Ohio Court, however, held that, "Neither of the foregoing rules constitutes, in our opinion, an unwarranted or untenable extension of the more traditional principles of products liability." *Id.* 392 N.E.2d at 1295. It rejected both theories, concluding that such a finding would require a "marked departure" from the law as set forth by the Ohio Supreme Court. *Id.* 392 N.E.2d at 1296, (citing *State Auto Mutual Ins. Co. v.*

*Chrysler Corp.,* 36 Ohio St.2d 151, 304 N.E.2d 891 (1973); *Lonzrick v. Republic Steel Corp.,* 1 Ohio App.2d 374, 205 N.E.2d 92 (1965); and, *Temple v. Wean United, Inc.,* 50 Ohio St.2d 317, 364 N.E.2d 267 (1977)).

The Ohio Court of Appeals has held that the holdings in the above three cases stand for the proposition that before a defendant could be held strictly liable in tort, a plaintiff must prove that the defect existed at the time the product left the defendant's hands. *Smith,* 392 N.E.2d at 1296. This opinion was based on the following conclusions reached by the Ohio Supreme Court:

> It is now well established that, in order for a party to recover based upon a strict liability in tort theory, it must be proven that: "(1) there was, in fact, a defect in the product manufactured and sold by the defendant; (2) *such defect existed at the time the product left the hands of the defendant;* and (3) the defect was the direct and proximate cause of the plaintiff's injuries or loss."

*Temple,* 364 N.E.2d at 270 (quoting *Chrysler Corp.,* 304 N.E.2d at 895) (emphasis added). As a result the Ohio Court of Appeals found as a matter of law that the Ford Motor Company could not be held strictly liable to the appellant. *Smith,* 392 N.E.2d at 1296.

It is clear that under Ohio law, a manufacturer who markets a product in an unassembled state, knowing that a third-party will complete the assembly process, cannot be strictly liable for a defect introduced by that third-party. *Id.* In this instance, therefore, Baughman is not liable to Grover Hill for any defect Ross may have brought into existence in the bin by having over-torqued the bolts during construction.

## II.

Appellant next argues that the District Court should be reversed because it misconstrued Ohio law by not holding the appellee liable for failure to *warn* Ross, the assembler of the bin, of the dangers involved in over-torquing bolts used in construction of the bin. The trial court rejected liability on

this basis because it believed Ross was an intervening, responsible party that broke the chain of causation between Baughman and Grover Hill.[7]

Appellant asserts, contrary to what the trial court apparently believed,[8] the fact that Ross obtained independent knowledge not to over-torque the bolts was irrelevant to the determination of proximate cause. The appellant primarily relies upon *Seley v. G.D. Searle and Co.,* 67 Ohio St.2d 192, 423 N.E.2d 831 (1981) as authority for its position.

The appellee contends, on the other hand, that the appellant is too late in raising the issue of any failure to warn. It argues that such was not raised in the pleadings or by appellant's counsel during trial.

Appellee continues, in any event, that warnings were not necessary in the circumstances of this case. Ross, the erector, was fully aware of the danger inherent in over-torquing. Moreover, Ross testified that he thought he was careful not to over-torque the bolts because he tested several along the way. Given Ross' awareness of the danger of over-torquing, appellee contends there was no duty on its part to warn again of that danger. Appellee relies on *Temple v. Wean United, Inc.,* 50 Ohio St.2d 317, 364 N.E.2d 267 (1977) and *Sams v. Englewood Realty Ready Mix Corp.,* 22 Ohio App.2d 168, 259 N.E.2d 507 (1969) as authority for its position.

■ Appellee's claim that appellant has not timely raised the duty to warn issue is not well-taken. The complaint was, *inter alia,* for breach of implied warranty and as such was sufficient under the Federal Rules of Civil Procedure to put the appellees on notice that the case would be tried on a strict liability theory, of which a failure to warn is frequently an element. *See* F.R. Civ.P. 8.

■ In addition, the issue regarding appellee's failure to supply Ross with an erection manual or, at least a supplement manual for bins such as the one herein, was specifically raised before the Court below. The record reveals that several questions were asked of Ross regarding appellee's failure to supply a manual. App. p. 166, 168. Thus, the issue of appellee's failure to warn is properly before this Court on appeal.

There appears little question in either party's position that absent Ross' awareness of the danger of over-torquing, the appellee would have owed a duty to warn him not to over-torque the bolts used in constructing the bin. Appellant, relying on *Seley v. G.D. Searle & Co.,* 67 Oh.St.2d 192, 200, 423 N.E.2d 831 (1981), contends that appellee's failure to warn raises a presumption that the failure was the proximate cause of the bin's collapse and that this presumption cannot be rebutted with evidence that Ross was already aware of the danger of over-torquing.

In *Seley,* the plaintiff ingested an oral contraceptive on her doctor's prescription. During a previous pregnancy the plaintiff experienced a condition known as toxemia. The defendant failed to provide plaintiff's doctor with an adequate warning that women who had ever experienced toxemia and then used the contraceptive would run a higher risk than normal of suffering a stroke. Within one year from the time her doctor had prescribed the contraceptive, and while she was taking it, the plaintiff suffered a debilitating stroke at the age of 26.

The Ohio Supreme Court concluded that for the plaintiff to prove the contraceptive

---

7. The District Court specifically concluded that the "actions of a contractor [Ross], not a party to this suit, was an *intervening proximate cause* in the failure of the bolts" App., p. 051. (emphasis added).

8. The trial court stated the following as apparent grounds for its belief that Ross was aware or should have been aware of the maximum amount of torque pressure that could be applied to Grade 2 bolts. "He [Ross] has attended meetings for dealers, attended schooling, and was familiar with Baughman literature"; he "had been selling and erecting Baughman bins since 1971, as many as seventeen a year." App., p. 050.

was the proximate cause of her injury she had to establish two things: first, that the lack of adequate warnings caused her to ingest the drug; and two, that ingestion of the drug proximately caused her stroke. The Ohio Supreme Court then stated:

> [W]here no warning is given, or where an inadequate warning is given, a rebuttable presumption arises, beneficial to the plaintiff, that the failure to adequately warn was a proximate cause of the plaintiff's ingestion of the drug. This presumption, absent the production of rebutting evidence by the defendant, is sufficient to satisfy the first branch of the plaintiff's proximate cause burden.

*Id.* 67 Ohio St.2d at 200, 423 N.E.2d 831 (citing *Ortho Pharmaceutical Corp. v. Chapman,* 180 Ind.App. 33, 388 N.E.2d 541 (1979); *Cunningham v. Charles Pfizer and Co. Inc.,* 532 P.2d 1377 (Okl.1975)).

■ The Court agrees with appellant that the presumption laid out in *Seley* applies in this case. It also agrees that the

9. Indeed, *Seley* directly stated as much when it said:

> A warning may serve purposes other than merely filling gaps in the intended recipient's knowledge—one may benefit from being warned or reminded of what he already knows. Similarly, only speculation can support the assumption that an adequate warning, properly communicated, would not have influenced the course of conduct adopted by a physician [whose conduct was alleged to constitute an intervening cause], even *where the physician had previously received the information* contained therein.

*Seley,* 67 Oh.St.2d at 201, 423 N.E.2d 831 (emphasis added) (footnote omitted).

The distinction, of course, between *Seley* and this case is that here there can be no speculation that another warning by Baughman would not have influenced the course of events as the District Judge believed they happened. Ross not only knew of the danger of over-torquing, but more importantly attempted, albeit unsuccessfully, not to over-torque the bolts. In the trial court's mind, he would have over-torqued regardless of whether he had been given another warning.

In *Seley,* the Ohio court was not convinced altogether that the course of events could not have been altered. It believed another warning to the physician may have helped because it realized that no physician would likely admit of his failure to remain informed of current medical and scientific developments where such

mere fact that Ross was aware of the danger of over-torquing would be insufficient as a matter of law to rebut that presumption.[9] It must be pointed out, however, that in this case the record is clear that Ross not only was *aware* of the danger but specifically testified that he attempted to prevent over-torquing. Indeed, he claimed he took affirmative steps not to over-torque.[10]

This case cannot, therefore, be characterized as one in which the presumption of proximate cause that arises from the manufacturer's failure to warn is rebutted solely on the basis that the third party already had knowledge of the danger of which the manufacturer failed to warn. Rather, there was a great deal of evidence suggesting that Ross not only knew of the danger but attempted to prevent it.

■ The law of Ohio requires that an efficient intervening cause, in order to

would be tantamount to an admission of malpractice. *Id.* at 201 n. 5, 423 N.E.2d 831.

The District Court in this case, on the other hand, believed another warning would not have been beneficial because it was not Ross' lack of awareness of the danger of over-torquing but rather his own *negligence* that was the sole proximate cause of the collapse of the bin.

10. The transcript reveals the following colloquy:

> Q [Counsel] Did the wrench that you used have what is known as a brake on it?
> A [Ross] No Sir.
> . . . .
> Q Did you open the wrench the full time by yourself?
> A. Eighty-five, ninety per cent of the time I tightened the bolts, yes.
> Q All right. Now, you also said you tested the bolts after?
> A Yes.
> Q Fastening them with a little four or five pound hand wrench.
> A We periodically check them.
> Q Check every bolt? By "periodically," what do you mean?
> A Well, couple times an hour.
> . . . .
> Q And you said that none of the bolts you tested were overtight?
> A No.
> Q Okay. But you didn't test every bolt?
> A That's right.

App., p. 151–52

break the chain of causation, must be one "not brought into operation by the original wrongful act, but operating entirely independent thereof; it must be such a cause as would have produced the result, without the cooperation of the original wrong." *Freeman v. U.S.,* 509 F.2d 626 (6th Cir.1975) (quoting *Dougherty, Administrator v. Hall,* 70 Ohio App. 163, 45 N.E.2d 608, 613 (1941). Ultimately, the determination whether an independent and intervening act is sufficient to cut off the chain of causation is a factual issue. *Utzinger v. U.S.,* 432 F.2d 485 (6th Cir.1970).

In the present case, the trial court judge made such a factual determination. He found in his opinion that the progressive fatigue failure of the bolts was probably the result of over-torquing, and further that the presence of "coin marks" was indicative of over-torquing. App., p. 050.

█ It is clear, therefore, that the District Court did not rely solely on the evidence of Ross' awareness of the danger of over-torquing to rebut the presumption that arises from the appellee's failure to warn. On the contrary, the court apparently believed Ross' testimony that he attempted not to over-torque the bolts, but concluded that through some inadvertence or negligence on his part, Ross over-torqued them anyway. Such would constitute an entirely independent wrongful act, and hence an intervening proximate cause under Ohio law.

█ The District Court's findings are conclusive on this appeal unless they are determined to be clearly erroneous. *Andrew Jergens Co. v. Conner,* 125 F.2d 686 (6th Cir.1942). Given that Ross testified he attempted not to over-torque the bolts and that he had adjusted approximately eighty-five to ninety percent (85–90%) of the bolts himself, and was aware of the danger of over-torquing, this Court cannot determine that the District Court was clearly erroneous in its findings. If Ross had not so testified, then of course the result might now be different.

## III.

At the trial of this case the appellant presented evidence to support its argument that Ross had actual or apparent authority from Baughman to provide erection services for the appellant's grain bins. Ross testified that he had for at least five years engaged in the practice of selling Baughman bins as its authorized dealer and distributor. He further stated that he erected the bins in accordance with manuals provided to him by the appellee and that he attended training sessions where he was instructed in the maintenance and repair of appellee's grain bins.

Despite the fact that the appellant raised this issue at trial, the District Court Judge made no specific finding as to whether Ross was the appellee's agent. The appellant now argues on appeal that the failure of the trial court to make this finding was error, requiring the case to be remanded so that such a finding can be made.

F.R.Civ.P. 52(a) imposes a duty upon the District Court Judge, before whom a case is tried without a jury, to "find the facts specially and state separately its conclusions of law thereon." Rule 52 does not indicate how elaborately a judge should make his findings. The Advisory Committee Note states only that the District Court Judge shall make "brief, pertinent findings and conclusions upon the contested matters."

█ This Court has enunciated a liberal standard for reviewing the adequacy of a District Court's findings. Findings should be comprehensive and relevant to the issues so as to provide a rational basis for the trial court's decision. *Deal v. Cincinnati Board of Education,* 369 F.2d 55 (6th Cir.1966). It is not necessary for the District Court Judge to prepare elaborate findings on every possible issue raised at trial. *Id.* However, there must be findings, in such detail and exactness as the nature of the case permits, of subsidiary facts on which an ultimate conclusion can rationally be predicated. *B.F. Goodrich Co. v. Rubber Latex Products, Inc.,* 400 F.2d 401 (6th Cir.1968). The findings should be explicit so as to give the appellate court a clear understanding of

the basis of the trial court's decision, and to enable it to determine the grounds on which the trial court reached its decision. *Id.*

Findings are to be liberally construed in support of a judgment, *Triangle Conduit and Cable Co. v. FTC,* 168 F.2d 175 (7th Cir.1948), *affirmed* 336 U.S. 956, 69 S.Ct. 888, 93 L.Ed. 1110 (1949), even though the findings are not as explicit or detailed as might be desired. *Travelers Insurance Co. v. Dunn,* 228 F.2d 629 (5th Cir.1956). If, from the facts found, other facts may be inferred which will support the judgment, such inferences should be deemed to have been drawn by the District Court. *Triangle Conduit and Cable Co.,* 168 F.2d at 179; *Brown v. Lykes Brothers Steamship Co., Inc.,* 484 F.2d 61 (5th Cir.1973).

Indeed, the failure to even make an express finding of a particular fact does not require reversal if a complete understanding of the issues may be had without the aid of separate findings. *Huard-Steinheiser, Inc. v. Henry,* 280 F.2d 79 (6th Cir. 1960); *Urbain v. Knapp Brothers Mfg. Co.,* 217 F.2d 810 (6th Cir.1954); *see also South-Western Publishing Co. v. Simons,* 651 F.2d 653 (9th Cir.1981); *Swanson v. Levy,* 509 F.2d 859 (9th Cir.1975).

Though the District Court Judge did not make a finding one way or the other as to the issue of agency, he did make some related findings. He found that Baughman did not offer erection services. He further found that Grover Hill Grain contracted with Ross to assemble and erect the bin. Finally, the court concluded: "The Court finds that the action of a contractor, not a party to this suit, was an intervening proximate cause in the failure of the bolts in question."

This Court is of the opinion that these findings are not sufficiently explicit so as to give it a clear understanding of the basis of the trial judge's decision. We are simply unable to determine the grounds upon which the District Court reached this conclusion. *B.F. Goodrich Co., supra; Huard-Steinheuser, Inc., supra.*

In this case a finding of agency or the lack of it cannot even be inferred from the more general findings. From the trial court's finding that Ross was an intervening proximate cause, this Court might infer that the trial judge must have found that Ross was *not* Baughman's agent. On the other hand, it would be equally permissible to conclude from such a finding that the District Court Judge reached his final decision without full consideration of this issue at all. This Court therefore concludes that the failure of the trial court to make a specific finding as to the question of agency requires that the matter be remanded for clarification and/or further consideration of the agency issue.

## IV.

Finally, appellant argues that the District Court erred by disregarding circumstantial evidence that the 1976 grain bin was defective because the bolts in the bin were inadequate in both number (design) and strength.

In its findings of fact the District Court Judge concluded:

"In the absence of any expert testimony on the change in bolt pattern and bolts, the Court *cannot* find that the change is of probative value to indicate a design defect." (emphasis added).

The appellant contends that this statement proves that the trial court excluded from its consideration *any circumstantial* evidence that the collapse of the bin was due to the grade and pattern of the bolts. Appellant argues that Ohio law clearly allows a design defect to be proved by *circumstantial evidence alone.* It would appear that this correctly states Ohio law.

Production of expert testimony is not necessary to prove the existence of a design defect. In the case of, *Friedman v. GMC,* 43 Ohio St.2d 209, 331 N.E.2d 702 (1975), we have found:

"A defect may be proven by circumstantial evidence, where a preponderance of the evidence established that the accident was caused by a defect and not other

possibilities, although not all other possibilities need be eliminated."

This view was followed in a more recent decision of the Ohio Supreme Court in the case of *Leichtamer v. American Motors Corp.,* 67 Ohio St.2d 456, 424 N.E.2d 568 (1981):

> The concept of "unreasonable danger," as found in section 402A, provides implicitly that a product may be found defective in design if it is more dangerous in use than the ordinary consumer would expect. Another way of phrasing this proposition is that "a product may be found defective in design if the plaintiff demonstrates that the product failed to perform as safely as an ordinary customer would expect when used in an intended or reasonably forseeable manner." *Barker v. Lull Engineering Co., Inc.,* 20 Cal.3d 413, 143 Cal.Rptr. 225, 573 P.2d 443 (1978).

 What *Leichtamer* does is to ease the plaintiff's burden of proof to the degree that circumstantial evidence alone, without expert testimony, would suffice to document the existence of a design defect.

The appellee does not dispute that this is the law in Ohio. Rather, Baughman argues that the appellant has misinterpreted the trial judge's finding and says that the District Court did *not* disregard the circumstantial proof offered by appellant at the trial in order to establish the presence of a design defect in the bin. It further contends that the trial court's finding should be read to mean the circumstantial evidence was considered along with the appellee's expert testimony to the contrary and that the trial judge simply found the appellee's proof more credible. If this was the Court's intent, it is not what was clearly said. Should the converse be true, then the Court's finding is unclear and does not adequately comply with F.R.Civ.P. 52(a). When this occurs, the usual procedure is to vacate the judgment and remand the case for appropriate findings. *Armstrong v. Collier,* 536 F.2d 72 (5th Cir.1976), *cited approvingly in Morelock v. NCR Corp.,* 546 F.2d 682 (6th Cir.1976).

The question of whether a design defect was responsible for the collapse of the bin is a factual issue requiring evaluation of evidence and testimony. In such situations an appellate court should not attempt to resolve the factual issues on its own but should vacate the judgment and remand for appropriate findings. *Morelock; Rule v. International Association of Bridge, Structural and Ornamental Iron Workers, Local Union No. 396,* 568 F.2d 558 (8th Cir.1977).

## CONCLUSION

This Court therefore concludes that the judgment below dismissing plaintiff-appellant's complaint be set aside and this cause remanded for further proceedings consistent with the views expressed herein.