837 F.2d 476
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Janet MILES, Individually and as next friend of Cassandra
Miles; Michael Glass; Edward Glass; Betty S.
Underwood; and George William Underwood
(86-3616, 86-3617),
Plaintiffs-Appellants,
v.
PAULDING COUNTY ROAD COMMISSIONERS & Paulding County
Engineer (86-3614) Defendants-Appellants,
v.
KOHLI & KALIHER ASSOCIATES, LTD. (86-3615) Defendant-Appellant,
v.
UNITED STATES STEEL CORPORATION and American Culvert &
Fabricating Co., Defendants-Appellees.
 Nos. 86-3614 to 86-3417.
 United States Court of Appeals, Sixth Circuit.
 Jan. 26, 1988.
 
 Before RALPH B. GUY, Jr., and BOGGS, Circuit Judges, and SUHREINRICH, District Judge.*
 RALPH B. GUY, Jr., Circuit Judge.
 
 
 1
 These consolidated cases arise as the result of the collapse of a culvert bridge in Paulding County, Ohio, on January 16, 1983, in which five people died and four were injured. Separate suits were filed in both the state courts of Ohio as well as in the United States District Court for the Northern District of Ohio. Jurisdiction in the federal suit was predicated upon diversity. 28 U.S.C. Sec. 1332.
 
 
 2
 After one of the defendants, American Culvert, filed a petition for bankruptcy, the cases were consolidated in the federal court for purposes of a determination of liability and punitive damages only. The primary and/or third-party defendants named in these cases, and who are party to this appeal, include United States Steel Corporation (U.S.S.), manufacturer and supplier of a multiplate arch used as a component of the bridge; American Culvert, which acted as the distributor in the sale of the arch structure from U.S.S. to Paulding County; Paulding County, owners and builders of the bridge; and Kohli & Kaliher Associates, Ltd., (Kohli & Kaliher), an engineering firm under contract to Paulding County to inspect the County's bridges from 1979 through the date of the collapse of the structure involved in this case, the Zuber Creek bridge.
 
 
 3
 Following extensive discovery, a motion for summary judgment was filed by U.S.S. and American Culvert in February of 1986 and granted by the district judge on June 2, 1986, thereby dismissing all claims against both defendants. Upon motion of all remaining parties, the trial judge entered an amended memorandum and order containing appropriate language to permit immediate appeal either via 28 U.S.C. Sec. 1292(b)[1] or Fed.R.Civ.P. 54(b).[2] Although this court denied interlocutory appeal pursuant to 28 U.S.C. Sec. 1292(b) on September 22, 1986, we will permit appeal under Rule 54(b) since the grant of summary judgment resolved all the parties' claims against both American Culvert and U.S. Stee. See generally Curtiss-Wright Corporation v. General Electric Company, 446 U.S. 1 (1980).
 
 
 4
 For the reasons which follow, the order of summary judgment is affirmed in part and reversed in part, and the case is remanded for further proceedings consistent with this opinion.
 
 I.
 
 5
 In the spring of 1972, the current Paulding County Engineer, Charles Dunakin, together with the County Commissioners, determined that the old steel truss bridge which spanned Zuber Creek needed to be replaced. Relying on his years of experience as a county engineer, Dunakin decided to utilize a culvert-type bridge to replace the old structure. He determined the size, span, shape, and gauge he would need by reference to some product catalogs he had received from a dealer, selecting one manufactured by U.S.S. In its catalog, the size, shape, gauge, flexibility factor and factors of safety of the culvert were predetermined by U.S.S. as matters intrinsic to its product. It is undisputed that the "bridge kit" selected by Dunakin, which included several curved, interlocking sections of steel plate along with all necessary hardware for complete assembly and a set of standardized blueprints and instructions on assembly and backfilling, was a standard item which had been mass marketed by U.S.S. for well over ten years prior to that time.
 
 
 6
 Paulding County then extended invitations to bid on the culvert, specifying the span, rise, and gauge which corresponded with the standard product catalog item of U.S.S. In making his selection, Dunakin did not consult with either U.S.S. or American Culvert, its dealer, as to the type of arch to use or to recommend specifications for the structure. The contract was awarded to American Culvert in April of 1972. Thereafter, a 96 foot long semi-circular plate arch with a 30 foot span, 15 foot one inch rise, made of three gauge steel material was ordered from AmBridge, a subdivision of U.S.S. The disassembled arch and component parts were shipped directly to the county in May of 1972, but construction of the bridge did not begin until the fall of 1973.
 
 
 7
 To install the culvert, concrete footings, embedded in the channels at the sides of the creek, were first poured. Next the arch, which was formed by bolting together the corrugated steel plates supplied by U.S.S., was placed in these footings. Headwalls, which are concrete structures formed to the contour of the arch, were then placed on each of the arch's four corners.
 
 
 8
 As explained in U.S.S.'s instructions furnished with the culvert, "the strength of the plate-arch structure is, to a large extent, dependent upon proper backfilling." This is so because the sectional plate design is relatively flexible and derives most of its resistance to externally applied weight from the "passive resistance" of the soil around it, as explained in AmBridge's product information. Therefore, the earthen backfill which is placed at the sides and over the top of the arch is the single most important structural component of the bridge and contributes, by virtue of its interaction with the arch, most of the strength of the completed structure. Theoretically, if the structure is properly built virtually the entire load will be deflected into the soil and the steel conduit will bear very little of it. The culvert's instructions specifically stated that "if it is necessary that backfill be made of good material properly placed and carefully compacted." They also directed that "[s]elected drainable backfill material is preferred, but most local fill material can be used provided it is carefully placed and compacted.... Granular material containing a small amount of silt or clay is ideal since it makes dense stable fill." The backfilling instructions also specified the performance of a Proctor Density Test to confirm proper compaction of the fill material as well as an offer to "[c]onsult American Bridge Division for specific job recommendations." In the construction of the Zuber Creek bridge, local soil composed primarily of clay was used as backfill. Although it appears that some attempt was made to follow the U.S.S. instructions, the moisture content of the fill was not tested nor was the soil compacted as directed. Following the backfill, gravel was placed over the culvert to bring it to the height of the road and a new road surface consisting of two and one-half inches of asphalt was laid.
 
 
 9
 Dunakin inspected the bridge during the summer of 1975 and noticed at this time that the arch was deflected slightly inward and had pulled back a little from the headwalls. The following year, Daniel Stouffer succeeded Dunakin as Paulding County Engineer. After his inspection of the bridge, Stouffer contacted American Culvert, stating that he believed there could be a problem with the culvert and requesting assistance. American Culvert then called William Wells, the U.S.S. Product Manager, and, on August 3, 1976, Wells examined the bridge in the company of an employee of the county. Although U.S.S. had never been consulted in the initial construction phase, Wells examined the bridge because it was company policy to follow-up on any complaints received involving their products. Wells noticed that there had been some patching on the road surface on either side of the bridge, indicating that there had been some subsidence of the backfill. He further observed that the arch appeared to be flattening on the sides in the 10:00 and 2:00 o'clock positions.
 
 
 10
 Following this inspection, Wells returned to the County Engineer's office and met with Stouffer. Although the substance of the exchange between the two men is disputed, a report prepared by an architectural firm on the bridge collapse concluded, on the basis of the deposition testimony of both Wells and the county employee who had accompanied him that day, that Wells informed Stouffer that continued movement of the arch could eventually lead to its collapse. Stouffer was advised to take periodic measurements of the bridge, and that if movement continued or buckling occurred, the backfill would have to be removed, proper arch geometry restored, and suitable backfill properly replaced and compacted. A few days later, Wells memorialized the essence of his observations and instructions in a letter to American Bridge, which was later hand delivered to Stouffer.
 
 
 11
 Based on Wells recommendations, county workers made measurements of the bridge, in August, October, and November of 1976.[3] When the third measurement deviated only slightly from the previous one, Stouffer decided to discontinue taking measurements, concluding the structure had stabilized. Notably, however, analysis of the bridge's surface following its collapse revealed that additional applications of asphalt had been applied to patch the road surface on numerous occasions between 1977 and 1982.'
 
 
 12
 Beginning in 1978, the engineering firm of Kohli & Kaliher contracted with the county to inspect its 210 bridges. Their initial report in 1978 found the Zuber Creek bridge to be in "good condition--no repair necessary," and noted none of the conditions previously observed by Dunakin, Stouffer, and Wells. The reports for 1979 through 1981 did note some deflection of the arch and gapping between the arch and headwalls. In their 1982 report, a large crack in the roadway above the centerline of the culvert was noted, along with increased movement from the headwalls and buckling of the arch. Following this report, a contractor was contacted about the possibility of lining the interior of the arch with shotcrete or possibly excavating the backfill and placing shotcrete on the outside of the arch. The contractor observed at this time that top of the arch had peaked approximately one foot above its original position. Unfortunately, before any final plan of action for repair of the bridge was settled upon, the collapse occurred.
 
 II.
 
 13
 The injured parties brought suit against all defendants on a variety of theories, and against U.S.S. and American Culvert under theories, collectively, of strict product liability, negligence, and express and implied warranty. Defendants U.S.S. and American Culvert asserted a variety of grounds for summary judgment; however, the district judge disposed of the majority of the claims by finding that defendants were entitled to the protection of the state's statute of repose for architects and engineers, Ohio Rev.Code Ann. Sec. 2305.131 (Anderson 1981).[4] Under that statute, "any person performing services for or furnishing the design, planning, supervision of construction, or construction" of an "improvement to real property" may not be sued for injuries resulting from such improvement's defective condition more than ten years after the furnishing of such services or construction. Because the district judge determined the applicable date to have been May 26, 1972, the date the culvert was delivered to Paulding County, all of the parties' tort claims were thus barred. Further, the court found that even if Paulding County's warranty claim was properly classified as contractual, it was barred by the state's applicable four year statute of limitations, Ohio Rev.Code Ann. Sec. 1302.98(A) and (B) (Anderson 1981). Lastly, the court rejected plaintiff's contention that a separate cause of action arose against U.S.S. under Sec. 324A of the Restatement of Torts 2d by virtue of Wells' inspection of the bridge in 1976. It was the court's opinion that no duty was created as a result of Wells' "courtesy" inspection, in which he identified the nature of the problem, advised Stouffer of his findings, and recommended a course of action.
 
 
 14
 Although the parties raise a host of arguments on appeal, we conclude that the majority of them are not essential to the proper resolution of the case, and those extraneous arguments will not be addressed.[5]
 
 
 15
 A. Applicability of the Architects and Engineers Statute of Repose
 
 
 16
 This question is clearly the lynchpin of this entire case. To date, no Ohio court has interpreted that portion of the statute dealing with persons entitled to benefit thereby. A federal court sitting in diversity is bound to apply the substantive law of the forum state, and if that state's highest court has not spoken to the question in controversy, our task is to discern how the state courts would respond if confronted with the question. Erie Railroad Co. v. Tompkins, 304 U.S. 64 (1938); see Clutter v. Johns-Manville Sales Corp., 646 F.2d 1151, 1153 (6th Cir.1981).
 
 
 17
 Basically, the statute requires a twofold inquiry: first, does the party claiming its protection qualify as one which the statute was intended to benefit, and second, did the injury arise out of the defective condition of "an improvement to real property." Failure to satisfy either prong will preclude application of the statute's ten-year limit on all tort-based claims. Because we find the answer to the first inquiry to be dispositive of this case, we do not address the issue of whether the Zuber Creek bridge constitutes an "improvement to real property."[6]
 
 
 18
 In determining the interpretation the Ohio courts would give to the phrase "any person performing services for or furnishing the design, planning, supervision of construction, or construction of" an integrated structure, a review of the general history of such statutes, which have been enacted by the majority of states, is instructive. In the mid-1960's, faced with what they considered to be an intolerable situation arising from judicial decisions abrogating the privity requirement in defective design cases, architects, engineers, and builders, through their respective professional associations, began a drive to alleviate the effects of this development. See Smith, Recent Statutory Developments Concerning the Limitations of Actions Against Architects, Engineers and Builders, 60 Ky.L.J. 462, 464 (1972). The American Institute of Architects, along with the National Society of Professional Engineers and the Associated General Contractors, began to push for model legislation which would substantially curtail the limitless duration of liability potentially imposed upon its members. Id. As originally enacted in 1963, Sec. 2305.131 protected only licensed architects and engineers. The statute was amended in 1971 to expand its protection to all persons providing services in connection with the design and construction of an improvement to real property.
 
 
 19
 In passing on the validity of architects' and engineers' statutes of repose, courts have generally ruled that mere suppliers of products, or "materialmen," are not protected by these statutes, and that such distinction is rationally related to the purposes underlying such statutes:
 
 
 20
 Suppliers, who typically produce items by the thousands, can easily maintain high quality-control standards in the controlled environment of the factory. A builder, on the other hand, can pretest his designs and construction only in limited ways--actual use in the years following construction is their only real test. Further, every building is unique and far more complex than any of its component parts.... The Legislature can rationally conclude that the conditions under which builders work are sufficiently difficult that limitations should be placed on their liabilities, but not on the liabilities of suppliers.
 
 
 21
 Freezer Storage, Inc. v. Armstrong Cork Co., 476 Pa. 270, 277, 382 A.2d 715, 719 (Pa.1978). See also Cinnaminson Township Board of Education v. U.S. Gypsum Co., 552 F.Supp. 855 (D.N.J.1982) (concluding that state's ten-year statute of repose did not bar claim against supplier of acoustical plaster containing asbestos).
 
 
 22
 Defendants urge us to include them under the statute's umbrella by tacitly admitting that they "designed" the particular culvert utilized as a component of the Zuber Creek bridge and then furnished this "design" to the county. We find this argument unpersuasive. Several courts have ruled that, considering the purpose and intent of such statutes, the "design" of a standardized product is not equivalent to the "design" of an improvement to real property within the meaning of the statute. A New Jersey court has explained, "[t]he problem as we perceive it is the ambiguity lurking in the word 'design' in this context.... This statute was not intended to benefit manufacturers and sellers of products who are uninvolved in the design, planning and construction of improvements to real estate. Product-design alone is not enough to trigger the applicability of [the statute of repose] ...." Wayne Township Board of Education v. Strand Century, inc., 172 N.J.Super. 296, 302, 411 A.2d 1161, 1163 (N.J.1980). The courts of Tennessee have similarly ruled that the word "design" within its statute of repose for architects and builders refers to the design of the improvement and not to the design of the manufactured products which go into the improvement:
 
 
 23
 We do not interpret "design" as used in the statute to mean the general design of a manufactured product which might be used in improvements of real estate. The meaning of the word is limited to the architectural or engineering design of a particular building or the particular parts thereof.
 
 
 24
 Pridemark Custom Plating, Inc. v. Upjohn Company, Inc., 702 S.W.2d 566, 570 (Tenn.App.1985). See also In Re Beverly Hills Fire Litigation, 672 S.W.2d 922 (Ky.1984) (manufacturer of aluminum wire used as component in construction project not included within protected class under Kentucky's architect's statute of repose). Cf. Adcor Realty Corp. v. Mellon-Stuart Co., 450 F.Supp. 769 (N.D.Ohio 1978) (under Ohio law, suit for damages regarding defective bricks incorporated into a building was properly characterized as products liability claim); Lonzrick v. Republic Steel Corp., 6 Ohio St.2d 227, N.E.2d 185 (1966) (steel roof joists were products subject to products liability law despite their incorporation into an improvement to real property).
 
 
 25
 This court has also upheld the exclusion of "materialmen" from the statute's protection in Hartford Fire Ins. v. Lawrence, Dykes, Goodenberger, 740 F.2d 1362, 1371-72 (6th Cir.1984). In Hartford, we pointed out that Sec. 2305.131 affects suits maintainable against three specific groups, two of which are persons "performing services for or furnishing the design, planning, supervision of construction, or construction" of an improvement to real property and persons who supply products used in construction of the improvement. Id. at 1371. We held that, "[o]nly the first group, the designers and builders, is covered by these statutes." Id. In so doing, we implicitly held that the "design" of the component product was distinguishable from the "design" of the improvement itself.[7]
 
 
 26
 The district court cited two Ohio cases in support of its conclusion that defendants qualified as "persons" included within the statute's ambit. The court noted that in Elizabeth Gamble Deaconess Home Ass'n v. Turner Construction Co., 14 Ohio App.3d 281, 470 N.E.2d 950 (1984), the appellate court stated that Sec. 2305.131 set forth a ten-year bar to actions against "architects, engineers, builders and others." (Emphasis in district court opinion only.) Review of that case reveals that it concerned an action against the architect and construction company involved in building the allegedly defective parking garage. The only question presented in that case was whether the statute barred both contract as well as tort claims. The court ruled that only tort claims were barred, with no discussion whatsoever as to the conceded applicability of the statute to the defendant parties.
 
 
 27
 The second Ohio case, Jones v. Ohio Bldg. Co., 40 Ohio Misc.2d 10, 447 N.E.2d 776 (Lucas Co. 1982), involved a suit against the installer of an allegedly defective service elevator. In granting summary judgment to the defendant, the court began by inquiring whether defendant fell within the protected class. In ruling in defendant's favor on this question, the court specifically noted that it was undisputed that the defendant designed, constructed, and installed the elevator specifically for use in the Ohio Building in 1954 and serviced the elevator via contract for several years thereafter. The court's holding was predicated upon these factual findings.[8]
 
 
 28
 It is apparent that these cases cannot support the broad proposition for which they were cited by the district judge. Based on the foregoing, which we believe to comport with the manner in which the Ohio courts would analyze this question, we conclude that U.S.S. and American Culvert, as suppliers of a standard product wholly unconnected with any specialized design or services in connection with the Zuber Creek structure as a unit, are not "persons" within the meaning of Sec. 2305.131.
 
 B. The Strict Products Liability Claims
 
 29
 While we do not accord defendants the protection of the Ohio statute of repose, we nevertheless uphold the grant of summary judgment as to the strict products liability claims. Our review of the record convinces us that defendants cannot be held liable under this theory as a matter of law.
 
 
 30
 Ohio has adopted the formulation of Sec. 402(A) of the Restatement of Torts 2d as to the elements required to establish strict liability. Temple v. Wean United Inc., 50 Ohio St.2d 317, 364 N.E.2d 267 (1967). In Temple, the court summarized these elements as follows:
 
 
 31
 (1) there was, in fact, a defect in the product manufactured and sold by the defendant; (2) such defect existed at the time the product left the hands of the defendant; and (3) the defect was the direct and proximate cause of the plaintiff's injuries or loss.
 
 
 32
 Id. at 321, 364 N.E.2d at 270 (quoting State Auto Mutual Ins. Co. v. Chrysler Corp., 36 Ohio St.2d 151, 156, 304 N.E.2d 891, 893 (1973)). Appellants here allege two theories of product defect: first, that the gauge of steel used rendered the culvert far too flexible for its reasonably forseeable intended use in the Zuber Creek project; and, second, failure to adequately stress the "critical importance" of the use of proper backfilling material as well as proper compaction of the fill in the product instructions.
 
 
 33
 As the United States Supreme Court has explained:
 
 
 34
 [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial .... The moving party is "entitled to judgment as a matter of law" because the nonmoving party has failed to make a sufficient showing on an essential element of her case ....
 
 
 35
 Celotex Corp. v. Catrett, 106 S.Ct. 2548, 2553 (1986). The Court further emphasized that Adickes v. S.H. Kress & Co., 398 U.S. 144 (1970), should not "be construed to mean that the burden is on the party moving for summary judgment to produce evidence showing the absence of a genuine issue of material fact, even with respect to an issue on which the nonmoving party bears the burden of proof." Id. at 2554 (emphasis added). We conclude, after a thorough review of the record, that appellants have failed to demonstrate a genuine issue of material fact under Ohio strict products liability law.
 
 
 36
 The sectional plate arch supplied by U.S.S. through American Culvert, the "product," was clearly only one component of the entire bridge structure. The bridge proper was comprised of the aggregate of the concrete footings, the culvert, the headwalls, the backfill, and the road surface. It is undisputed that the sectional plate arch conformed in all respects to the county's specifications when delivered. Despite conflicting expert testimony to the effect that the flexibility factor produced by the use of three gauge steel was too high, all of the experts agreed that the flexibility factor actually relates only to the handling of the structure and maintaining its shape during erection, and that if the shape of the arch is maintained during construction and the structure is properly backfilled, the thickness or strength of the metal arch itself is not pertinent to the strength or integrity of the completed bridge. All of the expert deposition testimony of record indicates that if the arch had been installed utilizing a proper backfill component--ideally gravel as opposed to the clay which was actually used--the subsequent performance of the arch would not have been affected by the so-called "flexibility factor." Finally, the expert testimony reveals a consensus that, while a thicker gauge or lower flexibility factor might have prolonged the period before collapse, it would not have prevented it.
 
 
 37
 In Grover Hill Grain Co. v. Baughman-Oster, Inc., 728 F.2d 784 (6th Cir.1984), the plaintiff sued the manufacturer of an unassembled grain bin for damages resulting from the bin's collapse. The cause of the collapse was determined to have been attributable to over-torquing of the bolts during construction. After reviewing the relevant state law, we concluded that "under Ohio law, a manufacturer who markets a product in an unassembled state, knowing that a third-party will complete the assembly process, cannot be strictly liable for a defect introduced by that third-party," and we thus affirmed the trial judge's verdict in favor of the manufacturer. Id. at 789. In the case at bar, the evidence cannot, as a matter of law, support a finding that the arch contained any manufacturing defect in existence at the time it left defendant's hands.
 
 
 38
 With respect to appellant's argument regarding inadequacy of warnings or failure to properly instruct, we observe that under Ohio law such allegations do not give rise to a strict liability cause of action. See Knitz v. Minster Machine Co., 69 Ohio St.2d 460, 432 N.E.2d 814 (1982); Temple v. Wean United, Inc., supra. In Temple, the Ohio Supreme Court stated:
 
 
 39
 It is ... apparent that the rule imposing an obligation on the manufacturer or seller to give suitable warning of a dangerous propensity of a product is a rule fixing a standard of care, and any tort resulting from the failure to meet this duty is, in essence, a negligent act.
 
 
 40
 50 Ohio St.2d at 325, 364 N.E.2d at 272. See, e.g., Rimer v. Rockwell International Corp., 739 F.2d 1125 (6th Cir.1984) (upholding, inter alia, verdict for manufacturer on issue of strict liability for failure to warn under Ohio law); Overbee v. Van Waters & Rogers, 706 F.2d 768 (6th Cir.1983) (affirming directed verdict for defendant on question of strict liability for failure to warn under Ohio law). Thus, it is clear that appellant's claims in this regard are cognizable, if at all, under a negligence standard only.
 
 
 41
 C. The 1976 Inspection by Wells on Behalf of U.S.S.
 
 
 42
 The district court granted summary judgment to defendants on the parties' claims of negligent inspection by Wells under Sec. 324A of the Restatement of Torts 2d. We agree and affirm.
 
 Section 324A provides:
 
 43
 One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if
 
 
 44
 (a) his failure to exercise reasonable care increases the risk of such harm, or
 
 
 45
 (b) he has undertaken to perform a duty owed by the other to the third person, or
 
 
 46
 (c) the harm is suffered because of reliance of the other or the third person upon the undertaking.
 
 
 47
 In his deposition, Stouffer, then Paulding County Engineer, gave conflicting and often equivocal testimony with respect to his meeting with Wells on August 3, 1976. At some points, he insisted that Wells never explained the danger of potential collapse nor gave explicit instructions regarding performance of the recommended periodic measurements or the point at which corrective measures, such as closing down the bridge and replacing the backfill, needed to be taken. However, he also repeatedly asserted that he had absolutely no recall of the specifics of their conversation:
 
 
 48
 Q. Is it safe to say that you do recall Mr. Wells having come to Paulding County to examine the culvert and speaking to you after his examination?
 
 
 49
 A. I don't remember if he did. I don't remember what he said if he did.
 
 
 50
 Stouffer Deposition at 274.
 
 
 51
 In contrast, Wells testified by deposition that he told Stouffer of the possible consequences if the bridge continued to move, describing what is known in the industry as the "tin can" effect (the steel plates buckle until they reach the snapping point). Wells further testified that he even drew a sketch of the arch to graphically show Stouffer at what point the deformation should cause concern and when it would be dangerous and approaching collapse. To determine whether the structure was continuing to move, he recommended periodic measurements of the arch be taken in the areas of the flattening plates, the span, the peak, and the base. Finally, Wells advised Stouffer that, if the bridge continued to move, the backfill would have to be removed, the arch restored to its original shape, and new backfill placed and compacted.
 
 
 52
 It is undisputed that Wells was never contacted again by the county. A few days after his visit, Wells recorded the gist of his observations and his recommendation for periodic measurements in a letter to American Culvert, which letter was subsequently hand delivered to Stouffer. In the report of the architects employed to analyze the causes of the bridge collapse, it was specifically found that Wells did notify Stouffer of both the necessity for periodic measurements to determine whether the structure had stabilized as well as the eventual consequences of continued unchecked movement. Further, it is undisputed that, although the third measurement taken by the county in November of 1976 still showed continued, albeit decreased, movement of the structure, the county unilaterally determined that no further measurements were necessary. Indeed, no further attempt was ever made to monitor the structure's continued movement despite the fact that the road surface required numerous subsequent applications of additional asphalt.
 
 
 53
 Although the district court found no reliance on the part of the County and no duty arising from this inspection, Wells admitted during his deposition that he knew the county was relying on him for an assessment of the nature of the problem which the bridge had developed. We conclude that, while he did incur a limited duty to ascertain the general nature of the problem and notify the county of his findings, that duty was clearly discharged.
 
 
 54
 In Thomas v. Tennessee Valley Authority, 769 F.2d 367 (6th Cir.1985), we held that even where a party has undertaken to conduct a safety inspection, once he has warned those in control of the premises of dangerous conditions, he is under no duty to ensure that the conditions have been corrected. In Thomas, a TVA safety inspector had discovered that a contractor, Jones, was using unsafe cable guardrails. TVA pointed out this problem to Jones and instructed it to correct the situation. No further action was taken by TVA, the contractor did not follow TVA's instructions and, thereafter, the decedent fell through the cable guardrail. Plaintiffs in Thomas claimed that TVA was negligent in noticing the safety violation and warning the contractor about it, but doing nothing further to correct the violation. The court, through Judge Edwards, affirmed the grant of summary judgment to TVA, stating that under Sec. 324A, "TVA's duty, if any, was simply to exercise reasonable care. The written and verbal instruction to cease using cable guardrails was a reasonable response to the hazard under these circumstances." Id. at 371. Although Judge Wellford, concurring, felt that the case was properly predicated on federal question rather than diversity jurisdiction, he nevertheless expressed agreement with Judge Edwards's rationale.
 
 
 55
 In the case at bar, Wells, although admittedly not trained in aspects of bridge inspection, correctly identified the nature of the problem and communicated his findings to the appropriate county authority. The Paulding County Engineer was a registered professional engineer and surveyor and, by law, was responsible for maintaining the county's roads and bridges. Wells was entitled to rely upon the County Engineer's qualifications, as well as his responsibility for the structure at issue, and was under no duty to anticipate the future lack of action by the county in response to the problem. As the Ohio Supreme Court observed in Swoboda v. Brown, 129 Ohio St. 512, 196 N.E. 374 (1935):
 
 
 56
 One may rightfully assume the observance of the law and the exercise of ordinary care by others, and action by him in accordance with such assumption in the absence of notice or knowledge to the contrary is not negligence.
 
 
 57
 Id. at 513. Accord Jones v. Wittenberg University, 534 F.2d 1203, 1210 (6th Cir.1976) (applying Ohio law).
 
 
 58
 We find no evidence that, by virtue of Wells's inspection, the defendants either "increase[d] the risk of harm" under Sec. 324A(a), undertook to perform a duty to correct the hazard which it pointed out to Paulding County under subsection (b), or that the harm was suffered because of the reliance of the injured parties or Paulding County upon any undertaking of the defendants via Wells's 1976 inspection under subsection (c). See Thomas, 769 F.2d at 371. Thus, the court below correctly held, as a matter of law, that defendants were not liable under Sec. 324A for Wells's acts or omissions allegedly arising from the 1976 inspection.
 
 
 59
 In conclusion, we hold that American Culvert and U.S.S. are not entitled to the shield of Sec. 2305.131 with respect to any of the claims asserted against them. However, summary judgment is granted to them as a matter of law as to all pending products liability claims as well as claims arising out of their employee's inspection of August 1976. The case is remanded for further proceedings with respect to the claims of negligence; in addition, the warranty claims must be reevaluated since the district court based its dismissal of those claims primarily upon the time limitations bar of Sec. 2305.131, which we have held inapplicable as to these defendants. Nothing in this opinion should be taken to preclude the subsequent grant of summary judgment to the defendants on these remaining claims, if warranted.
 
 
 
 *
 Honorable Richard F. Suhrheinrich, United States District Court, Eastern District of Michigan, sitting by designation
 
 
 [1]
 28 U.S.C. Sec. 1292(b) provides:
 When a district judge, in making in a civil action an order not otherwise appealable under this section, shall be of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation, he shall so state in writing in such order. The Court of Appeals which would have jurisdiction of an appeal of such action may thereupon, in its discretion, permit an appeal to be taken from such order, if application is made to it within ten days after the entry of the order: Provided, however, That application for an appeal hereunder shall not stay proceedings in the district court unless the district judge or the Court of Appeals or a judge thereof shall so order.
 (emphasis in original).
 
 
 [2]
 Fed.R.Civ.P. 54(b) states, in pertinent part:
 (b) Judgment Upon Multiple Claims or Involving Multiple Parties. When more than one claim for relief is presented in an action, whether as a claim, counterclaim, cross-claim, or third-party claim, or when multiple parties are involved, the court may direct entry of a final judgment as to one or more but fewer than all of the claims or parties only upon an express determination that there is no just reason for delay and upon express direction for the entry of judgment.
 
 
 [3]
 The county's measurements were as follows:
 8576
 North End # 1 = 20' 1"
 Center # 2 = 20' 2 1/2"
 South End # 3 = 20' 3/4"
 10176
 North End # 1 = 19' 9 1/"
 Center # 1 = 20' 1/2"
 South End # 3 = 19'11"
 111676
 North End # 1 = 19' 9 1/2"
 Center # 2 = 20' 1"
 South End # 3 = 19'11"
 
 
 [4]
 [Sec. 2305.13.1] Sec. 2305.131 Limitation of actions against architects and engineers, non-application of statute
 No action to recover damages for any injury to property, real or personal, or for bodily injury or wrongful death, arising out of the defective and unsafe condition of an improvement to real property, nor any action for contribution or indemnity for damages sustained as a result of said injury, shall be brought against any person performing services for or furnishing the design, planning, supervision of construction, or construction of such improvement to real property, more than ten years after the performance or furnishing of such services and construction.
 
 
 [5]
 Defendants protest strenuously on appeal that appellants conceded below that they were "designers" of the Zuber Creek bridge and should therefore be barred from contending otherwise on appeal. While it is true that the main thrust of appellants' arguments in the district court were to this effect, we find that the parties, by alternatively alleging liability for a defective product (either by virtue of the use of an improper gauge of steel or provision of instructions which inadequately stressed the "critical importance" of backfillin), or as the "designer" of the entire bridge structure, placed this question in dispute
 In any event, even if the parties had conceded below that defendants were "designers" of the bridge, the question of whether the specific acts of defendants' entitled them to protection as "performing services for or furnishing the design" of that structure as contemplated under Sec. 2305.131 is a question reserved for the court and reviewable by us de novo.
 
 
 [6]
 Although we do not reach the question, we observe that, in Adair v. Koppers Co., Inc., 741 F.2d 111 (6th Cir.1984), we held that a coal conveyor system, a component part of the entire factory complex, constituted an "improvement to real property" under Sec. 2305.131. Adair sets forth the relevant factors for the determination of whether a structure or unit thereof comprises an "improvement to real property" under the statute. See also Kozikowski v. Delaware River Port Authority, 397 F.Supp. 1115 (D.N.J.1975) (holding that a bridge constituted an "improvement to real property" under analogous state statute of repose)
 
 
 [7]
 Significantly, the court went on to conclude that the elevator, although only one component of the entire structure, constituted an "improvement to real property" within the meaning of the statute
 
 
 [8]
 We further concluded in Hartford that the statute did not violate either the "Open Court' provision of the Ohio Constitution or the due process or equal protection clauses of either the Ohio or the federal constitutions. Just prior to oral argument in this case, the Ohio Supreme Court struck down Ohio's four-year medical malpractice statute of repose as violative of the Open Court provision of the Ohio Constitution. Hardy v. VerMeulen, 32 Ohio St.3d ---(No. 86-1448, August 12, 1987). Although certain plaintiffs in the case at bar urge us to extend the rationale of Hardy to invalidate the architects and engineers statute of repose as well, we decline to do so since our conclusion that neither of the defendants here is entitled to the protection of the statute makes it unnecessary to reach this issue