RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 20a0118p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

No. 19-5160

*v.*

ADAM C. VANCE,

*Defendant-Appellant*.

Appeal from the United States District Court
for the Eastern District of Kentucky at Covington.
No. 2:18-cr-00010-1—David L. Bunning, District Judge.

Decided and Filed: April 17, 2020

Before: MOORE, KETHLEDGE, and BUSH, Circuit Judges.

_____

## COUNSEL

**ON BRIEF:** Michael M. Losavio, Louisville, Kentucky, for Appellant. Javier A. Sinha, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., Charles P. Wisdom, Jr., UNITED STATES ATTORNEY'S OFFICE, Lexington, Kentucky, Elaine K. Leonhard, UNITED STATES ATTORNEY'S OFFICE, Ft. Mitchell, Kentucky, for Appellee.

_____

## OPINION

_____

JOHN K. BUSH, Circuit Judge. This is a case of an elderly couple sadly taken advantage of by their great-grandson, who defrauded them and stole his great-grandfather's identity through abuse of modern banking technology.

Adam C. Vance was convicted of one count of access-device fraud, in violation of 18 U.S.C. § 1029(a)(5), and two counts of aggravated identity theft, in violation of 18 U.S.C. § 1028A(a)(1). He was sentenced to 65 months' imprisonment and three years' supervised release. On appeal, Vance argues that the district court (1) failed to make adequate findings of fact after his bench trial under Fed. R. Crim P. 23(c); (2) improperly denied his motion for judgment of acquittal; and (3) failed to correctly calculate the loss amount connected to his charges, under Sentencing Guidelines § 2B1.1. We **AFFIRM**.

**I.**

**A.     Facts Underlying the Conviction**

In 1990, Selena Spriggs opened a checking account at what is now U.S. Bank in Elsmere, Kentucky, to receive her social security checks. A few years later, Mrs. Spriggs added her husband, Charles Spriggs, to the account. However, Mr. Spriggs neither used the account nor opened any of the related monthly bank statements sent to his home.

On September 6, 2017, Vance filled out an application in Mr. Spriggs's name for a debit card that could draw on the U.S. Bank checking account. It is unclear why the application was made, given that Mr. Spriggs had never used a debit card, nor did he know how to use one. According to Mr. Spriggs, although he had previously given his great-grandson the limited authority to cash checks that Mr. Spriggs might write for him, at no point had he authorized Vance to use the bank account in any other way. In addition, during an interview with investigators, Mrs. Spriggs denied giving her great-grandson permission to make out a debit card application in her husband's name.[1]

Yet, despite lacking authorization from his great-grandparents, Vance used the card in his great-grandfather's name thereafter for his own expenses. In fact, at various times, bank cameras photographed him using the debit card to withdraw cash. *See* Trial, R. 77 (#578-83); Gov't Ex. 3; Gov't Ex. 4; Trial, R. 72 (#432-45) (explaining that the photos of Vance using the ATMs

---

[1]Because of her medical condition, Mrs. Spriggs was unable to testify at trial. However, Vance did not object to the introduction of her out-of-court statements; rather, Vance elicited such statements during his cross-examination of the investigator.

corresponded to the documented debit-card transactions). Vance also reportedly used the card to rent hotel rooms in his name, fund maintenance on his car, and pay for rides through the ride-sharing app, Lyft. In order to fund these purchases and ATM withdrawals, a total of $15,000 in cash advances were made to the Spriggses' U.S. Bank account from a credit line associated with the account.**[2]**

On October 3, 2017, an online loan application requesting $15,000 was submitted to U.S. Bank in Mr. Spriggs's name. As testified to by a U.S. Bank employee, the loan was approved. However, when the employee called the listed phone number on the application to inform Mr. Spriggs of the loan's approval, a young man—not a 90-year old, as Mr. Spriggs was—answered the phone. When the employee asked to speak to "Charles [Mr. Spriggs]," the young man requested that she wait a moment; however, according to the employee's testimony, when the alleged elderly "Charles" finally came to the phone, she recognized the voice as belonging to the same young man with whom she had just spoken. Trial, R. 72 (#455-57). Yet, when questioned about this on the phone by the employee, the young man continued insisting he was "Charles." The employee, feeling uncomfortable with the situation, then explained to "Charles" that the closing of the loan would be contingent on him physically coming to the branch with identification. Immediately upon hanging up, the employee told her coworker that "Charles" "[did] not sound like a 90-year-old man on the phone." *Id*. (#457). And incidentally, the "Charles" on the phone never came in person to the bank to close the loan.

Instead, on October 12, 2017, Vance entered a different bank—Huntington Bank, in Fort Mitchell, Kentucky—where he opened a checking account. Although this time Vance used his own name, address, phone number, and email address in the application, he listed Mr. Spriggs's social security number on the application as his own. Upon approval of the application, Vance deposited $1,000 into the account, but he withdrew the entire amount within one week.

---

**[2]**On September 19, 2017, a $9,980 cash advance was requested via mobile phone, and later deposited into the Spriggses' account. On October 4, 2017, a $5,020 cash advance was requested online and deposited into the account. The Government alleges that Vance's unauthorized uses of the debit card through these aforementioned activities are the bases for his access-device fraud charge (count 1) and aggravated identity theft charges (counts 2 and 3).

On October 16, 2017—prior to Vance withdrawing all of the money from the account at Huntington Bank—an online application was submitted to that financial institution for a $10,200 loan. This application was filed from an I.P. address belonging to Vance's mother. The online loan application was filled out with Vance's name, address, phone number, and email address; however, similar to the checking-account application he had earlier submitted to Huntington, this online application used Mr. Spriggs's social security number. Ultimately, however, because the social security number did not correspond with Vance's identity, Huntington denied the loan.[3]

Upon being notified by U.S. Bank and Huntington Bank about suspicious activities involving his identity, Mr. Spriggs filed a police report, claiming he was the victim of fraud and identity theft. On October 17, 2017, the police arrested Vance. Approximately one week later, when searching Vance's car, the police located a large stash of personal and financial documents belonging to the Spriggses, which included bank statements for the U.S. Bank account, tax-return forms, property-tax bills, and the title to Mr. Spriggs's car.

**B.** **Proceedings Below**

At the pretrial conference, Vance requested a bench trial, waived his right to a jury, and asserted his right to request specific findings of fact pursuant to Federal Rule of Criminal Procedure 23(c). Granting all three requests, the district court proceeded to conduct a two-day bench trial.

During trial, the government presented evidence of the facts set forth above related to Vance's access-device fraud charge and aggravated identity theft charge. The proof included the testimony of several witnesses, including Mr. Spriggs, a Secret Service agent who interviewed Mrs. Spriggs, and several employees from Huntington Bank and U.S. Bank.[4]

The defense called two witnesses—Vance's mother, Tammy Buck, and Vance's grandmother, Jennifer Spriggs. Buck stated that she was currently seeking guardianship over

---

[3]The government alleges that Vance's uses of Mr. Spriggs's social security number for both the checking account application and the loan application form the bases for Vance's aggravated identity theft charge (count 3).

[4]Relating to the "interstate commerce" element of 18 U.S.C. § 1029, an employee of U.S. Bank employee testified that this bank is headquartered in Minneapolis, Minnesota, and that all of the U.S. Bank debit-card transactions at issue are processed through normal banking channels.

Mr. Spriggs. On the subject of Vance's relationship with his great-grandparents, Buck testified to the following: (1) Mr. and Mrs. Spriggs frequently gave Vance money; (2) Vance was authorized by Mr. Spriggs to handle the latter's money, including the U.S. Bank account; and (3) the Spriggses had allowed Vance to use their credit card on various occasions in the past. Jennifer Spriggs, who was Mrs. Spriggs's guardian, admitted that Mr. Spriggs had recently decided to write her out of his will. On the subject of Vance's relationship to his great-grandparents, Jennifer Spriggs testified to the fact that (1) Mr. and Mrs. Spriggs would allow Vance to write checks and use their credit card to pay his bills; and (2) Mr. Spriggs had asked Vance to assist him with his finances.

Upon the closing of proof, the court found Vance guilty of one count of access-device fraud, in violation of § 1029(a)(5), and two counts of aggravated identity theft, in violation of § 1028A(a)(1). Verdict, R. 73. The court orally stated its findings, concluding that the elements of all charges had been proven by the government beyond a reasonable doubt. The court rejected Vance's pre-trial claims that his great-grandfather suffered from dementia, and therefore, lacked credibility as a witness. Instead, the court determined that Mr. Spriggs was credible and competent based on an assessment of his medical records. According to the court, it "didn't find anything in the records at all that would even hint that [Mr. Spriggs] had some memory loss or inability to testify credibly at trial." Verdict, R. 73 (#518).

As for Tammy Buck and Jennifer Spriggs, the district court found neither to be credible. Specifically, according to the court, Buck had "a motive to lie," given that she was "trying to obtain a guardianship over" Mr. Spriggs, and Jennifer Spriggs had "a motive to lie" considering the fact that Mr. Spriggs had recently "written [her] out of his will." *Id.* (#519).

Following the entry of judgment on the conviction, Vance filed a timely appeal.

## II.

Vance advances two challenges to his access-device fraud and aggravated identity theft convictions. First, he argues that the district court failed to make adequate factual findings as required after a bench trial pursuant to Federal Rule of Criminal Procedure 23(c). Second, he

argues that the government failed to present sufficient evidence to support all of the elements of the charges beyond a reasonable doubt.

We address these arguments below.

**A.　　Standard of Review for Adequacy of Factual Findings**

This court reviews the adequacy of the district court's findings in a criminal bench trial under the same standards it uses to judge the adequacy of factual findings in jury-waived civil trials under Federal Rule of Civil Procedure 52. *See United States v. Fruehauf Corp*., 577 F.2d 1038, 1072 (6th Cir. 1978) (holding that the findings of fact made by the district judge fully complied with the requirements of Fed. R. Crim. P. 23(c) (citing *B. F. Goodrich Co. v. Rubber Latex Products, Inc*., 400 F.2d 401, 402 (6th Cir. 1968); *Deal v. Cincinnati Board of Education*, 369 F.2d 55, 63-64 (6th Cir. 1966), *cert. denied*, 387 U.S. 847 (1967)); *see also United States v. Hogue*, 132 F.3d 1087, 1090 (5th Cir. 1998) ("Certain of the standards for determining whether a trial court's findings of fact are adequate are the same in civil and criminal cases.").

Therefore, we review a district court's factual findings to determine if they "support the ultimate legal conclusions reached." *Zack v. Comm'r*, 291 F.3d 407, 412 (6th Cir. 2002). However, "[w]e do not insist that trial courts make factual findings directly addressing each issue that a litigant raises." *Id.* (citing *In re Fordu,* 201 F.3d 693, 710 (6th Cir. 1999) ("We have not interpreted [Rule] 52 to require trial courts to explicitly treat each issue raised.")); *see also Grover Hill Grain Co. v. Baughman–Oster, Inc.,* 728 F.2d 784, 792 (6th Cir.1984) ("It is not necessary for the District Court Judge to prepare elaborate findings on every possible issue raised at trial."). Instead, we adhere to "a liberal standard for reviewing the adequacy of the [trial court's] findings." *Zack*, 291 F. 3d at 412 (citing *Grover Hill Grain Co.,* 728 F.2d at 792)). Under this standard, "findings are to be liberally construed in support of a judgment, even if the findings are not as explicit or detailed as might be desired." *In re Fordu,* 201 F.3d at 710.

Still, even with this court's liberal approach, "the trial court's findings must support the ultimate legal conclusions reached." *Zack*, 291 F.3d at 412 (quoting *Grover Hill Grain Co.,* 728 F.2d at 792) (explaining that "there must be findings, in such detail and exactness as the nature of the case permits, of subsidiary facts on which an ultimate conclusion can rationally be

predicated")).  Such findings are essential to "reveal the logic behind the trial court's decision," and they must "enable an appellate court to conduct a meaningful review of the trial court's order."  *Id.* (citing *Grover Hill Grain Co.,* 728 F.2d at 792–93) ("The findings should be explicit so as to give the appellate court a clear understanding of the basis of the trial court's decision, and to enable it to determine the grounds on which the trial court reached its decision."). Ultimately, however, this court operates under the principle that "[i]f, from the facts found, other facts may be inferred which will support the judgment, such inferences should be deemed to have been drawn by the District Court."  *Grover Hill Grain Co.,* 728 F.2d at 793.

### B.      Standard of Review for Evidentiary Sufficiency

In our review of evidentiary sufficiency, we assess a district court's specific factual findings following a bench trial for clear error.  *United States v. Jabara*, 644 F.2d 574, 577 (6th Cir. 1981); *United States v. Caseer*, 399 F.3d 828, 840 (6th Cir. 2005).  A district court's factual determination is "clearly erroneous when 'although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction' that the district court made a mistake."  *United States v. Ellis*, 938 F.3d 757, 761 (6th Cir. 2019) (quoting *United States v. Vasquez*, 352 F.3d 1067, 1070 (6th Cir. 2003)).  "[A] district judge's finding of fact is not clearly erroneous simply because there is evidence in the record that might support a different finding."  *Fruehauf Corp.*, 577 F.2d at 1041 n.3.

Similarly, in reviewing the district court's ultimate finding of a defendant's guilt, we assess "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *United States v. Wright*, 774 F.3d 1085, 1088 (6th Cir. 2014) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).  This court "neither independently weighs the evidence, nor judges the credibility of witnesses who testified at trial."  *United States v. Howard*, 621 F.3d 433, 460 (6th Cir. 2010) (quoting *United States v. Talley*, 164 F.3d 989, 996 (6th Cir. 1999)).  And, because the district court, as the finder of fact, is best placed to determine witness credibility, *see United States v. Bingham*, 81 F.3d 617, 635 (6th Cir. 1996), this court will "defer to the district court's credibility determinations absent reason to believe that they are clearly erroneous."  *United States v. Wright*, 747 F.3d 399, 409 (6th Cir. 2014).

**C.      Analysis**

Guided by these standards of review, we evaluate first whether the district court's findings "support the ultimate legal conclusions reached" of Vance's guilt under 18 U.S.C. § 1029(a)(5) and 18 U.S.C. § 1028A. *Zack*, 291 F.3d at 412. We then address "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Wright*, 774 F.3d at 1085. Both inquiries are addressed below as to the charges underlying the conviction.

**1.      Access-Device Fraud Charge (Count 1)**

Count 1, which charged Vance with access-device fraud under § 1029(a)(5), requires that the government prove Vance (1) knowingly used an access device issued to another person; (2) possessed an intent to defraud; (3) obtained any thing having an aggregate value of $1,000 or more over the course of one year by using the access device; and (4) affected interstate or foreign commerce by using the access device. According to 18 U.S.C. 1029(e)(1), an "access device" is "any card . . . or other means of account access that can be used . . . to obtain money, goods, services, or any other thing of value, or that can be used to initiate a transfer of funds." Vance does not dispute that he knowingly used an access device issued to another person and that he obtained more than $1,000 over the course of 41 days by using the access device. He does dispute, however, whether there was sufficient proof and adequate findings that he possessed an intent to defraud and that he affected interstate or foreign commerce by using the access device. We consider these latter elements below.

**a.      "Affects Interstate Commerce"**

To satisfy the interstate-commerce element of the access-device fraud statute, § 1029(a), Vance's offense must have "affect[ed] interstate or foreign commerce." *See United States v. Scartz*, 838 F.2d 876, 879 (6th Cir. 1988) (stating that § 1029(a)(1) requires proof that use of the access device "in some way affected interstate commerce"). The interstate-commerce element can be satisfied in many ways, including when an out-of-state bank's "banking channels [are] used for gaining authorization approval of the charges on the cards." *Scartz*, 838 F.2d at 879. The government introduced sufficient evidence for the district court to find that this standard was

satisfied beyond a reasonable doubt, and the court made adequate factual findings related to this element.

Indeed, with little contestation, the district court found that the government proved beyond a reasonable doubt that Vance's access-device fraud affected interstate commerce. The court underscored its conclusion by even noting that "[t]here was never any issue regarding [whether Vance's access-device fraud] affected interstate commerce." Verdict, R. 73 (#516). The court then referenced the government's witness from U.S. Bank, who testified that (1) Vance's debit-card transactions associated with the U.S. Bank account were processed, as all debit-card transactions are customarily processed, through the bank's normal banking channels; and (2) the debit card obtained by Vance was issued in Kentucky, a different state from where U.S. Bank is headquartered in Minnesota.[5] This proof related to interstate commerce was sufficient to support the conviction, *see Scartz*, 838 F.2d at 879; *see also United States v. Drummond*, 255 F. App'x 60, 64-65 (6th Cir. 2007) (unpublished) (concluding that defendant's possession of credit card numbers issued by foreign and interstate banks was sufficient evidence to support the interstate-commerce element of § 1029), and the court's findings more than satisfied this court's "liberal standard for reviewing the adequacy of the [trial court's] findings" related to the interstate element. *Zack*, 291 F.3d at 412 (citation omitted; alteration in original).

### b.      "Intent to Defraud"

An individual violates the access-device fraud statute when he or she "knowingly and with intent to defraud effects transactions, with 1 or more access devices issued to another person." 18 U.S.C. § 1029(a)(5). However, given the general nature of fraud crimes, "direct evidence of a defendant's fraudulent intent is typically not available"; therefore, this court allows "specific intent to defraud [to] be established by circumstantial evidence and by inferences drawn from examining the scheme itself which demonstrate that the scheme was reasonably calculated [by the defendant] to deceive persons of ordinary prudence and comprehension."

---

[5]Offering additional commentary on this element, the district court referenced the bank witness's testimony to validate its conclusion that "[the interstate commerce element] wasn't a contested issue at the bench trial." Trial, R. 72 (#516-517).

*United States v. Winkle*, 477 F.3d 407, 413 (6th Cir. 2007) (quoting *United States v. Yoon*, 128 F.3d 515, 523-24 (7th Cir. 1997)).

According to the district court, there was "more than ample circumstantial evidence" to support its finding that Vance had the intent to defraud. Verdict, R. 73 (#518). This circumstantial evidence, as the court outlined, included the following:

- testimony of Mr. Spriggs, who stated that he never authorized Vance (1) to obtain a debit card in Mr. Spriggs's name; (2) to withdraw money from the U.S. Bank account with that debit card; (3) to make purchases with that debit card; or (4) to draw on a line of credit associated with the U.S. Bank account;

- testimony of the U.S. Bank representative who spoke with Vance over the phone, coupled with additional documentary evidence, showing that Vance pretended to be Mr. Spriggs during the course of the fraud;

- evidence submitted from the government's investigation of Vance, following his arrest, which included a trove of documents with Mr. Spriggs's name, personal identifiers, and financial information in Vance's car;

- documentary evidence showing that after obtaining the debit card from U.S. Bank, Vance spent the entire line of credit quickly—in a matter of one week; and,

- related documentary evidence showing that after he obtained the debit card, Vance drained the U.S. Bank account in a matter of one week.

Notwithstanding this evidence presented by the government and outlined by the court, Vance contends that the factual findings related to the requisite "intent to defraud" element are inadequate and the evidence was insufficient. In support of both claims, he offers three arguments: (1) the court erred in its analysis by focusing on whether Vance lacked "authorization" from the Spriggses to use the debit card, as opposed to Vance possessing an "indicia of fraud," Br. at 39; (2) under *U.S. v. Nixon*, 694 F.3d 623 (6th Cir. 2012), the district court was required to find that Vance possessed an intent to defraud both at the time he obtained the debit card from U.S. Bank, and then also when he used the debit card; and (3) the district court erred in relying on Mr. Spriggs's testimony (which the government offered for the specific purpose of showing Vance's intent to defraud) because the court erred in its initial determination that Mr. Spriggs was a "credible" witness, unaffected by trouble with memory recall. We find all of these arguments misplaced.

When making its factual finding that Vance did demonstrate a necessary intent to defraud, the court cited statements made in Mr. Spriggs's testimony and Mrs. Spriggs's interview, which supported its conclusion that Vance demonstrated an intent to defraud. The court did not err in emphasizing Vance's lack of "authorization" to use the debit card, as testified to by Mr. Spriggs, and supported by Mrs. Spriggs's interview (which was also in evidence). The court's findings were adequate to "reveal the logic behind [its] decision," to "enable [us] to conduct a meaningful appellate review." *Zack*, 291 F.3d at 412 (citing *Grover Hill Grain Co.,* 728 F.2d at 792–93); *see United States v. Gustafson*, 30 F.3d 134 (Tbl.), 1994 WL 276883, at *3 (6th Cir. June 21, 1994).

Based upon such a review, we conclude the evidence was sufficient to support the district court's finding of Vance's intent to defraud. In *United States v. Warshak*, this court determined that a defendant's lack of authorization from the proper owners of credit cards, constituted valid circumstantial evidence of his intent to defraud those customers. 631 F.3d 266, 316 (6th Cir. 2010) (finding the government had proven defendant's specific intent to defraud under § 1029(a)(5) when it referenced the defendant's own testimony that he "deliberately charged customers' credit cards without permission"); *see also United States v. Farkas*, 935 F.2d 962, 966 (8th Cir. 1991) ("All the witnesses testified that their credit cards had been used without their authorization. Thus, the evidence, viewed most favorably to the government, clearly permits the inference that these credit card numbers were 'obtained with intent to defraud.'"). Similar circumstantial evidence was presented by the government here.

Such evidence included: (1) Vance's attempted impersonation of Mr. Spriggs, both on the phone with the bank representative and in paper and online-bank applications; (2) Vance's deliberate decision to conduct the majority of his transactions online or on a cellular phone (likely a tactic to maintain his anonymity); and (3) the haste in which Vance depleted the money from both the U.S. Bank account and the associated line of credit he established after having obtained the debit card in Mr. Spriggs's name attached to the account.

Collectively, this proof supports the district court's inference that Vance was operating with the speed and level of anonymity of someone who lacked the authorization to use his great-

grandparents' debit card for his personal purchases. Therefore, the district court did not commit clear error in determining that the government had shown Vance's intent to defraud.

Vance argues on appeal that his great-grandmother *may have* actually authorized his use of the U.S. Bank account, but there is sufficient evidence in the record for the district court's finding otherwise. Given her existing illness, Mrs. Spriggs did not testify in court. However, her statements made to third-party investigators were properly admitted by the government into the record. In these statements, she indicated the following: (1) that she did not remember having the U.S. Bank account; and (2) that she never authorized Vance to obtain or use a debit card attached to that account. Furthermore, as referenced above, Vance's numerous actions— including his impersonation of Mr. Spriggs; the haste with which he drained the U.S. Bank account and the attached line of credit; and the fact he conducted the majority of his transactions online or over the phone—seem inconsistent with his having received Mrs. Spriggs's authorization. Although Vance references the testimony of his defense witnesses that his great-grandparents *occasionally* allowed him to use their credit card to buy them food in the past, the district court reasonably could have found that these prior authorized uses are not relevant to the debit-card transactions associated with the U.S. Bank account. Moreover, the district court was entitled to determine, as it did, that the defense witnesses were not credible based on their stated motives, meaning their testimony was not credited at all in the process of the court reaching its verdict.

Vance cites *United States v. Nixon* for the proposition that under 18 U.S.C. § 1029(a)(2), the government must show that a defendant possesses an intent to defraud "both when the 'access device' is *obtained* and when it is later *used*." 694 F.3d 623 (6th Cir. 2012) (citation omitted). Though a creative argument, the reference is irrelevant to the facts at hand, given that *Nixon* involved subsection (a)(2) of 18 U.S.C. § 1029 (prohibiting the use of an "*unauthorized* access device," as defined as "any access device that is lost, stolen, expired, revoked, canceled, or obtained with intent to defraud," § 1029(e)(3))—not § 1029(a)(5) (prohibiting the use of access devices that include "any card . . . or other means of account access that can be used to obtain any thing of value, 1029(e)(1)."). This court applies different legal frameworks to analyze the use of these two types of access devices. Under § 1029(a)(5), this court does not require the

government to show that the defendant obtained the access device with an intent to defraud; the government must only show that the defendant possessed an intent to defraud at the time the device was used. *See* 18 U.S.C. § 1029(a)(5) (declaring it unlawful if a person "knowingly and with intent to defraud effects transactions, with 1 or more access devices issued to another person").

The district court did not commit clear error when it relied on Mr. Spriggs's testimony. This court "defer[s] to the district court's credibility determinations absent reason to believe that they are clearly erroneous." *Wright*, 747 F.3d at 409. We see no reason to disturb the district court's credibility determination.

Despite Vance's claims to the contrary, Mr. Spriggs's medical records do not state that he was diagnosed with dementia. *See generally* App. at 196-245. Although one medical report indicates that Mr. Spriggs has "mild cognitive impairment," *id*. at 244, the reports otherwise describe him as being "alert," *e.g., id*. at 204, 207, 213, 216, 227, 240, 243, "oriented to person, time, and place," *e.g., id*. at 206, 207, 240, 243, "negative for confusion, [and] decreased concentration," *e.g., id.* at 204, 232, 242, and as having normal "mood," "affect," "behavior," "judgment," and "thought content," *e.g., id*. at 204, 207, 240. These findings provide an ample basis for the district court's conclusion that the medical records fail to suggest Mr. Spriggs's "inability to testify credibly at trial." Verdict, R. 73 (#517-18).

Additional support for this conclusion is offered simply by the fact that the district court is best placed to observe the credibility of a witness, with this case being no exception. Here, the court was able to judge in person Mr. Spriggs's "behavior . . . upon the witness stand," which included his "manner of testifying" and the "accuracy of [his] memory." *Dunn Appraisal Co. v. Honeywell Info. Sys. Inc*., 687 F.2d 877, 881-82 (6th Cir. 1982) (citation omitted).

Therefore, in our deferential review of the district court's findings here, we deem that the court's credibility determination was not clearly erroneous.

### 2. Aggravated Identity Theft Charges (Counts 2 and 3): Factual Findings & Evidentiary Sufficiency

Counts 2 and 3, which charged Vance with aggravated identity theft under § 1028A, require that the government show Vance (1) knowingly used, without lawful authority, a means of identification of another person; and (2) used that means of identification during and in relation to an enumerated predicate felony. 18 U.S.C. § 1028A. Predicate felonies under § 1028A(c)(5) include "any provision contained in chapter 63 (relating to mail, bank, and wire fraud)." Relevant to this case, chapter 63 includes the bank-fraud statute, 18 U.S.C. § 1344.

### a. Vance's Use of Mr. Spriggs's Identity

The central basis relied upon by the government to show Vance's aggravated-identity-theft conviction under count 3 was his use of his great-grandfather's social security number at Huntington Bank to open a checking account and then apply for a loan. The district court appropriately recognized the value of this evidence, and ultimately agreed that "sufficient circumstantial evidence" demonstrated that "it was [Vance] . . . who submitted [the Huntington Bank] loan application by using Mr. Spriggs' Social Security number" in the application. Verdict, R. 73 (#521).

Despite Vance's claims to the contrary, the district court's finding as to the "identity" element was not inadequate. Rather, the district court accurately referenced the circumstantial evidence provided by the government to support this conclusion. This evidence included: (1) that the I.P. address used to request the loan was registered to Vance's mother; and (2) that Vance had recently opened a checking account at Huntington Bank by way of a paper application, in which he used Mr. Spriggs's social security number. Collectively, these findings are sufficient for our court to engage in "meaningful appellate review." *Zack*, 291 F.3d at 412 (citing *Grover Hill Grain Co.,* 728 F.2d at 792–93).

Our review finds sufficient evidence to support the court's determination that it was Vance—and not someone "in Hong Kong," Trial, R. 77 (#640)—who applied for the Huntington Bank loan online in his great-grandfather's name. Foremost to the government's case, was the fact that the loan application shared several significant consistencies with the application Vance

had submitted to Huntington Bank in person a few days earlier.  Namely, both applications listed Vance's name as the applicant, along with his address, email address, phone number and date of birth; yet, both applications listed Mr. Spriggs's social security number in the relevant social security number boxes.  Gov't Ex. 5g; Trial, R. 77 (#634-37); Verdict, R. 73 (#521-22); *compare* Gov't Ex. 5a (account application), with 5g (loan application).

The documented evidence that Vance had previously submitted an online loan application at U.S. Bank also supports the likelihood that he submitted the subsequent Huntington Bank application.  In fact, it is very unlikely that Mr. Spriggs took out this loan, given that, as he testified at trial, he did not like to take out loans, nor did he like to owe people money.  It seems equally unlikely that this 91-year-old man or his 86-year-old wife would be applying for loans via the internet.  Thus, we turn to Vance, who not only knew Mr. Spriggs's social security number, but had an established history of conducting online transactions using his great-grandfather's personal information (including a history of attempting to obtain loans in Mr. Spriggs's name, using the latter's personal information).  In addition, Vance was found with a collection of documents belonging to his great-grandparents in his car (some of which had Mr. Spriggs's social security number listed).  Collectively, this evidence supports the district court's finding that it was Vance who applied for the Huntington Bank loan.

The last piece of evidence supporting the district court's finding that Vance submitted the loan application is the fact that the I.P. address used in connection with the online loan application belonged to his mother.  Vance does not dispute that this I.P. address was  hers,  and he does not argue that his mother applied for the loan.  The I.P. address thus points to Vance as the one who submitted the application.  Nonetheless, he continues to insist that it was an identity thief "in Hong Kong" who may have made the submission.  Trial, R. 77 (#640).  The district court had sufficient basis to reject Vance's story.  As the district court noted, "it would have been very odd for someone else [other than Vance]" to apply for the Huntington loan via the online application form.  Verdict, R. 73 (#521-22).

Vance also asserts in passing that the government's evidence in relation to the identity element is insufficient because it failed to be authenticated under Federal Rule of Evidence 901.  However, this argument is waived, given that Vance neither objected to the evidence at trial, nor

does he even properly raise an evidentiary claim on appeal. *See United States v. Brown*, 819 F.3d 800, 829 (6th Cir. 2016) (stating that arguments on appeal that are "unaccompanied by any legal support or developed argumentation" are deemed waived).

> **b.     "During and in Relation to a Predicate Attempted Bank Fraud"**

In declaring its verdict and factual findings as to count 3, the district court explained that Vance had committed aggravated identity theft "during and in relation to a bank fraud violation, the bank fraud being the attempted bank fraud involving the Huntington Bank." Verdict, R. 73 (#520). The court also found "that [Vance] did attempt to commit bank fraud and that he used the means of identification of another person during and in relation to that attempted bank fraud." *Id*. (#522). Vance advances two arguments to challenge the adequacy of these findings, neither of which is persuasive.

First, Vance challenges the adequacy of the findings based on the district court's statement that Vance's conduct occurred in relation to "attempted bank fraud," as opposed to the court's explicitly citing the bank-fraud statute on which it was relying. Br. at 46. This argument is misplaced. Subsection (c)(5) of 1028A refers to only *one* bank-fraud violation in chapter 63 as a predicate offense (defining the predicate felonies as including "any provision contained in chapter 63 (relating to mail, bank, and wire fraud)"). That enumerated bank-fraud violation is 18 U.S.C. § 1344. Therefore, it is sufficiently clear the bank-fraud violation to which the district court referred when it wrote "attempted bank fraud" *See* Verdict, R. 73 (#520).

Second, Vance argues that the government presented no proof that Huntington Bank constitutes a requisite "financial institution," under the bank-fraud statute, § 1344. Again, his argument is misplaced. Under 18 U.S.C. § 20(1), a "financial institution" is defined as "an insured depository institution (as defined in section 3(c)(2) of the Federal Deposit Insurance Act"). In turn, section 3(c)(2) of the Federal Deposit Insurance Act provides that "[t]he term 'insured depository institution' means any bank or savings association the deposits of which are insured by the [FDIC] pursuant to this chapter." 12 U.S.C. § 1813(c)(2). Therefore, because the government submitted undisputed documentary evidence showing that Huntington Bank was insured by the Federal Deposit Insurance Corporation (FDIC), *see* Gov't Ex. 5c at 1

("Huntington National Bank is a Member FDIC."), there was sufficient proof for the district court to find that Huntington Bank constitutes a "financial institution" under § 1344.

**III.**

Vance also challenges the procedural reasonableness of the 65-month imprisonment sentence handed down by the district court. He argues that the district court failed to correctly calculate the loss amount accrued by his great-grandparents under Sentencing Guidelines § 2B1.1, the Guidelines' "loss provision."

This court reviews the factual findings made by the district court at sentencing for clear error. *United States v. Collins*, 799 F.3d 554, 592 (6th Cir. 2015). Such findings subject to clear-error review include the district court's determination of the amount of loss attributable to a defendant. *Warshak*, 631 F.3d at 328-29 (citing *United States v. Jordan*, 544 F.3d 656, 671 (6th Cir. 2008)).

When a loss amount is in dispute, "either the government must prove the loss amount by a preponderance of the evidence, or the district court may conduct judicial factfinding to determine the loss amount." *United States v. Poulsen*, 655 F.3d 492, 513 (6th Cir. 2011). Nonetheless, the district court need not "establish the value of the loss with precision"; rather, the court is required only to "publish the resolution of contested factual matters that formed the basis of the calculation." *United States v. Nelson*, 356 F.3d 719, 723 (6th Cir. 2004)).

The Sentencing Guidelines establish an automatic base offense level of six for access-device fraud. U.S.S.G. § 2B1.1(a)(2). In turn, the loss provision, U.S.S.G. § 2B1.1(b)(1), directs a sentencing court to increase the offense level based on the amount of "loss" accrued in connection with the defendant's conduct. If the loss amounts to a sum greater than $40,000 but less than $95,000, then the Guidelines impose a six-level increase on the offense level. *Id.* § 2B1.1(b)(1)(D).

Loss under subsection (b)(1) is defined as "the greater of actual loss or intended loss." *Id.* cmt. n.3(A). "Actual loss" "means the reasonably foreseeable pecuniary harm that resulted from the offense," *id.* cmt. n.3(A)(ii), whereas an "intended loss" includes "both the amount the

victim actually lost and any additional amount that the perpetrator intended the victim to lose." *United States v. Mickens*, 453 F.3d 668, 672-73 (6th Cir. 2006) (quoting *United States v. Carboni*, 204 F.3d 39, 47 (2d Cir. 2000)).

"In calculating the Guidelines loss under U.S.S.G. § 2B1.1(b)(1), district courts include losses sustained from relevant conduct under U.S.S.G. § 1B1.3." *United States v. Catchings*, 708 F.3d 710, 720 (6th Cir. 2013). "Relevant conduct" generally includes a defendant's conduct that occurred during or in preparation for the underlying offense. U.S.S.G. § 1B1.3(a)(1)(A).

Yet, even with the various guideposts offered by the Guidelines, a sentencing court "need only make a reasonable estimate of the loss . . . based on available information." U.S.S.G. § 2B1.1 cmt. n.3(C). Because a "sentencing judge is in a unique position to assess the evidence and estimate the loss based upon that evidence," its "loss determination is entitled to appropriate deference." *Id*.

The initial presentence investigation report (PSR) prepared by the Probation Office stipulated that the loss caused by Vance was less than $40,000. However, the government objected to the PSR's findings, arguing that Vance's conduct had an "intended loss" of over $40,000. According to the government, a portion of the "intended losses" related to Vance's relevant conduct of forging checks, totaling approximately $3,450, in Mrs. Spriggs's name. Sentencing, R. 74 (#532-33); Gov't Ex. 1a-n. Agreeing with the government, the Probation Office recalculated the loss amount and ultimately determined that Vance had caused an intended loss of $40,366.95.

During sentencing, the district court overruled Vance's objection to the second finding of the PSR, concluding that a preponderance of the evidence demonstrated that Vance had caused an "intended loss" of over $40,000. Sentencing, R. 74 (#528, 533). The district court reached this total based on its amassing of the following "actual" and "intended" amounts connected to Vance's fraudulent activities:

- **$14,237.25** in *actual losses* accrued by U.S. Bank, based on the money Vance spent after taking cash advances from the checking account's line of credit he fraudulently obtained. *Id.* (#532-33).

- **$15,000** in *intended losses* potentially faced by U.S. Bank, based on Vance's attempted fraudulent loan from U.S. Bank. *Id.* (#532).

- **$10,200** in *intended losses* potentially faced by Huntington Bank, based on Vance's attempted fraudulent loan from Huntington Bank. *Id.* (#531).

- **$3,450** in *actual losses* accrued by the Spriggses for Vance's relevant conduct of forging checks in Mrs. Spriggs's name. *Id.* (#532-33).

- **$929.70** in *actual losses* accrued by Mr. Spriggs for Vance's relevant conduct of using Mr. Spriggs's credit card to make Home Shopping Network purchases for himself. *Id.* (#533).

Accordingly, the district court's final loss determination resulted in a six-level enhancement. PSR, R. 61 (#209 ¶ 29).

With the six-level loss enhancement calculated, the district court then proceeded to calculate Vance's final sentence by way of the following steps:

- First, the court took account of Vance's criminal history category of V. *Id*. (#214 ¶ 52).

- Second, in consideration of the fact that Vance's scheme affected vulnerable victims, the court imposed a two-level increase, meaning that Vance's advisory Guidelines range was 33 to 41 months' imprisonment for the Count 1 access-device fraud. Sentencing, R. 74 (#542); *see* PSR, R. 61 (#219 ¶ 85).

- Third, the court noted that both of Vance's aggravated-identity-theft counts (Counts 2 and 3) had a statutorily required mandatory sentence of 24 months' imprisonment. Sentencing, R. 74 (#535)

Based on these considerations, the district court sentenced Vance to a total of 65 months' imprisonment; this total includes two concurrent 24-month sentences for his aggravated-identity-theft counts, which will run consecutive to a 41-month sentence for the access-device fraud count, followed by three years of supervised release.

Vance challenges the district court's sentence, claiming that the final loss amount calculation was too high.[6] He makes two specific arguments: (1) that the district court clearly

---

[6]Vance claims that he is raising both procedural- and substantive-unreasonableness claims to challenge the district court's sentence. However, because his sentencing argument challenges only the district court's loss-amount

erred in relying upon the assumption that Vance was not authorized to sign checks in Mrs. Spriggs's name, because, according to Vance, her testimony at trial was required to prove that she had not provided authorization to Vance; and (2) the district court clearly erred because the government failed to present sufficient evidence linking Vance's identity to many of the debit-card transactions at issue.

However, for reasons presented in the analysis of Vance's factual findings and evidentiary sufficiency claims, we conclude that the district court did not commit clear error in calculating that the loss amount attributed to Vance's conduct was over $40,000.

According to Vance, the district court erred in its determination that Mrs. Spriggs had not authorized Vance to use the U.S. Bank account or write checks in her name, given that Mrs. Spriggs did not testify at trial. We find this argument tenuous. First, although Mrs. Spriggs could not testify at trial because of her failing health, the absence of her testimony is immaterial because she provided verified statements to government investigators, which were submitted into evidence for trial. Notably, in those statements, Mrs. Spriggs indicated that she never gave Vance permission to use or obtain a debit card for her bank account; and in fact, she did not even remember having an account at U.S. Bank. The district court credited this evidence at sentencing, stating: "Selena [Mrs. Spriggs] told the case agent—while she didn't testify—that she did not authorize [Vance's] use of her account or any payment of checks." Sentencing, R. 74 (#534). In addition, during Mr. Spriggs's trial testimony—which the district court also deemed credible—he stated that he had never given Vance authorization for these activities either. The district court referenced these statements during sentencing as well, explaining that Mr. Spriggs was "clearly not happy with what had transpired," and concluding that "ultimately, [Mr. Spriggs] did not authorize any of these transactions." Sentencing, R. 74 (#534).

The testimony of the defense witnesses, Tammy Buck and Jennifer Spriggs, did not undermine the conclusions made by the court at sentencing. Both women stated that *sometimes* Mr. and Mrs. Spriggs would allow Vance to use their credit card to buy them food. However, aside from the district court's determination that neither of the defense witnesses was credible,

calculation—which relates to procedural unreasonableness, not substantive unreasonableness, *see United States v. Jones*, 641 F.3d 706, 712 (6th Cir. 2011)—this court addresses only the procedural reasonableness question.

their statements were irrelevant, as they spoke about a past credit card owned by Mr. and Mrs. Spriggs—not the debit card and forged checks at issue here, both of which drew upon the U.S. Bank account. The district court's loss-determination calculation only related to losses connected to this account. Sentencing, R. 74 (#534-35) ("[A]lthough there was some testimony that [Vance] used this credit card of [Mr. Spriggs] for a few purchases on occasion, the amount listed . . . was a total amount of unauthorized transactions from [the U.S. Bank account] debit card.").[7]

Finally, we find unpersuasive Vance's argument that the district court clearly erred in its calculations because it relied upon an erroneous assumption that his identity was linked to many of the fraudulent debit-card transactions. As outlined in the factual findings and evidentiary sufficiency analysis, the government offered sufficient evidence showing it was Vance—not an unknown individual—who used the Spriggses' debit card. This evidence included photos of Vance using the card, Trial, R. 77 (#578-83); Gov't Ex. 3, as well as receipts documenting that purchases made with the card were under Vance's name, Gov't. Ex. 2. The district court underscored the importance of this evidence for its sentencing determinations, explaining "[t]he evidence submitted during the bench trial was credible and more than sufficient for the Court to conclude, by a preponderance of the evidence, that [Vance] himself was the individual who tried to defraud both U.S. Bank and Huntington Bank." Sentencing, R. 74 (#533). And, because the district court held that the government presented sufficient evidence to prove the requisite identity element of Vance's access-device fraud and aggravated identity-theft convictions (meaning, that the court concluded that Vance's identity was linked to the fraudulent debit card purchases), then it would not be clear error for the court to conclude that the government had shown Vance's identity was linked to the fraudulent charges by a preponderance of the evidence at sentencing.

---

[7]Furthermore, the district court explained that even if it had failed to include in its calculations some of the disputed forged checks (which Vance still claims were authorized for the benefit of his great-grandparents), the loss connected to Vance's conduct would still amount to a total over $40,000. Sentencing, R. 74 (#534-35).

In light of the above, we conclude that the district court did not commit clear error in calculating the loss attributed to Vance's conduct under the Guidelines. Therefore, Vance's sentence was procedurally reasonable.

**IV.**

We conclude that (1) the district court made adequate factual findings as to Vance's guilt related to the access-device fraud charge under 18 U.S.C. § 1029 and the aggravated identity theft charge under 18 U.S.C. § 1028A; (2) there was sufficient evidence to support the court's findings of guilt related to both charges; and (3) the court properly calculated the loss amount under the Guidelines, and therefore, Vance's sentence was procedurally reasonable. We therefore **AFFIRM**.